796 P.2d 87

John W. EVANS, and the Estate of L. Juanita Evans, Plaintiffs–Appellants,

v.

TWIN FALLS COUNTY, a governmental entity; Harold Jensen, Gary Kaufman, and Mark E. Stevens, individuals, Defendants–Respondents.

No. 17977.

Supreme Court of Idaho.

June 12, 1990.

Dissent on Denial of Petition for Rehearing Sept. 7, 1990.

Lojek & Gabbert, Chartered, Boise, for plaintiffs-appellants. Donald W. Lojek, argued.

Hamlin & Sasser, Boise, for defendants-respondents. David Sasser, argued.

BAKES, Chief Justice.

John and Juanita Evans brought suit against Twin Falls County and several deputy sheriffs alleging, *inter alia*, claims under 42 U.S.C. § 1983 for violation of their constitutional rights, assault and battery, false arrest and interference with contract. The Evanses' claim of damages was primarily for emotional distress. Subsequently, Juanita Evans died, and the complaint was amended to substitute "the Estate of L. Juanita Evans,"[1] and to allegedly add a wrongful death claim on behalf of Mr. Evans.[2] The district court granted summary judgment in favor of the defendants as to all theories of liability. Plaintiffs appeal.

The summary judgment record, viewed most favorably to the appellants, discloses that on April 15, 1987, six Twin Falls County deputy sheriffs went to the residence of John and Juanita Evans to execute on a writ of execution issued on a judgment which had previously been entered against the Evanses. Apparently six officers were dispatched because of a letter from the attorney levying the writ which was attached to the writ of execution and which warned the officers to expect resistance.

Three of the deputies—Kaufman, Jensen and Stevens—entered the house. The Evanses claim that only Kaufman was invited in, that Jensen and Stevens were asked to leave and that they refused. The Evanses' complaint alleged that the deputies stood in the doorway with their hands on their guns "very much like Gestapo agents," and on one occasion threatened "to arrest" Mr. Evans. Respondents denied these allegations and further submitted the deposition of Elmer Durraud, a farm implement repairman who was present at the scene, who stated that he did not hear any such threats of arrest.

The Evanses advised the deputies that the farm equipment upon which they wished to execute did not belong to the Evanses. Their complaint further stated that the deputies were "rude, loud, vulgar, threatening and unnecessarily demanding," and made the Evanses feel like prisoners in their own home. However, respondents point out that Mr. Evans admitted in his deposition that none of the deputies used profane language or restricted the Evanses from coming and going. Mrs. Evans tried unsuccessfully to contact her attorney by phone on one occasion and on a second attempt to use the phone it was alleged that Deputy Jensen restrained her from doing so by grabbing her arms and twisting them, forcing her downward, knocking the glasses off her face and causing her immense visible pain. Deputy Jensen stat-

---

1. While the title to the amended complaint describes the plaintiffs as "John W. Evans and the Estate of L. Juanita Evans," the amended complaint, other than adding one sentence to Paragraph X alleging "this conduct was a proximate cause of the death of L. Juanita Evans who continued to suffer great emotional distress resulting in a fatal heart attack on March 23, 1988," was substantially identical to the wording of the original complaint. There was no allegation of the appointment of a personal representative of the estate who is joining the action as a party plaintiff in the amended complaint.

2. The amended complaint gives no indication that John W. Evans is bringing a wrongful death action. His claim in the amended complaint is no different than his claim in the original com-

plaint filed before the death of Mrs. Evans. The amended complaint does not allege that John W. Evans is either the personal representative of the estate of L. Juanita Evans, or a surviving heir who is authorized to bring a wrongful death action for the death of L. Juanita Evans under I.C. § 5–311. Nevertheless the district court, apparently assuming that plaintiff's amended complaint alleged a claim for wrongful death on behalf of John W. Evans, found that the uncontradicted evidence demonstrated that none of the defendants' acts proximately caused the death of Mrs. Evans. The case has been argued on appeal as though such a wrongful death claim had been pled. Accordingly, we address that issue in Part I.

ed that Mrs. Evans made disparaging remarks to him and she came at him with raised hands trying to strike him, but he warded her off.

The Evanses stated that the officers refused to accept a personal check for the judgment, while the officers stated that it was the policy of the county not to accept personal checks. The Evanses eventually agreed to satisfy the judgment against them with a cashier's check. The officers followed Mrs. Evans to the bank in town where she obtained a cashier's check, gave it to the officers, who thereupon radioed back to the house and told the remaining officers to leave.

The Evanses aver that this incident left Mrs. Evans profoundly shaken, upset, agitated, and deeply embarrassed and disturbed. Two days after the incident she went to see Dr. Carl Bontrager at Magic Valley Memorial Hospital, who prescribed a sedative and diagnosed her condition as "hyperventilation and acute anxiety." Mrs. Evans also saw Dr. James Spafford on September 22, 1987 (about five months after the incident), as she was complaining of back aches and headaches which she believed were related to the alleged altercation with Deputy Jensen. Dr. Spafford's opinion was that she was experiencing an "agitated depressive reaction, capsulitis of the shoulder, and hyperventilation syndrome."

Mr. Evans stated that in the months following the incident Mrs. Evans was a "changed woman," that she cried frequently, talked of the incident constantly, was extremely nervous and depressed, and that the condition persisted up until her death from a heart attack on March 23, 1988 (some eleven months after the incident).

The Evanses filed a complaint against Twin Falls County and the three deputy sheriffs on December 23, 1987, three months before Mrs. Evans' death. The complaint alleged claims for assault and battery, unlawful arrest and violation of 42 U.S.C. § 1983, interference with the work of a contract mechanic,[3] and sought general damages for emotional distress, punitive damages, and special damages for medical expenses and lost mechanic's wages. On July 5, 1988, Mr. Evans filed an amended complaint allegedly adding a count for wrongful death, and asserting that Mrs. Evans' death was due to the incident in the house on April 15, 1987.

On February 15, 1989, District Judge Daniel B. Meehl entered a memorandum opinion granting respondents' motion for summary judgment and dismissing appellants' complaint with prejudice in its entirety. As to Mrs. Evans' assault and battery claims and the consequent physical and emotional injury and pain, the district court ruled that this kind of injury was personal to Mrs. Evans and therefore did not survive her death. Regarding the wrongful death claim, the district court relied upon the medical testimony of both the treating and examining doctors who found no connection between the death of Mrs. Evans and the incidents on April 15, 1987. The district court dismissed the affidavit testimony by Mr. Evans, who claimed there was a causal connection between these events, as "inadmissible evidence" because it was "not valid medical testimony."

The district court also ruled that the Evanses' claims for false arrest, false imprisonment, interference with contract and assault and battery were barred under I.C. § 6–904, and further held that there was no factual support for a claim for false arrest or false imprisonment at any rate.

As to the constitutional claims under 42 U.S.C. § 1983, the district court found that "Mr. Evans has not stated any actions taken by the deputies that may have violated his constitutional rights." This was based upon Mr. Evans' deposition which admitted that none of the deputies had physically

---

**3.** While the plaintiffs' complaint alleged that the defendants interfered with a mechanic whom they had working on the machinery that afternoon, and "plaintiffs were thereby damaged in an amount and owing to the mechanic for time during work which he could not then perform the work," the mechanic testified in his deposition that he was not told that he could not work on the equipment, only that he could not move the equipment which had been levied on pursuant to the writ of execution. Accordingly, there is no factual basis for this claim.

restricted Mr. Evans' free movement or his coming or going; that none of the deputies had told him that he could not leave the house. The trial court further observed that, even if Mr. Evans' complaint could be construed as containing a claim for negligent infliction of emotional distress, it failed under the decision in *Gill v. Brown*, 107 Idaho 1137, 695 P.2d 1276 (Ct.App. 1985), because there was no physical contact or injury to Mr. Evans. Likewise, the district court found that the record did not support a claim of intentional infliction of emotional distress based on *Davis v. Gage*, 106 Idaho 735, 682 P.2d 1282 (Ct.App.1984). As to Mrs. Evans' claim of a violation of 42 U.S.C. § 1983, the district court ruled that the incidents of April 15th do not "shock the conscience of the court," and therefore the constitutional threshold had not been met by the plaintiffs. We will analyze these various claims separately.

I

THE WRONGFUL DEATH CLAIM

■ Assuming that Mr. Evans' complaint alleges a wrongful death claim, we first address the issue of whether the district court erred in granting summary judgment in favor of the deputies on any alleged wrongful death claim. Mr. Evans contends that the alleged grabbing and shaking of Mrs. Evans on April 15, 1987, had an ongoing deleterious effect that resulted in her ultimate death from cardiac arrest on March 23, 1988. The district court held that the alleged incidents of April 15, 1987, were not the proximate cause of Mrs. Evans' death, relying on the testimony of Dr. Stott, an expert in cardiovascular disease, and the testimony of Drs. Bontrager and Spafford, who had both examined and treated Mrs. Evans. In Dr. Stott's opinion there was "no causal relationship whatsoever between any of the events that had occurred at the Evans home on April 15, 1987, and Mrs. Evans' death as a result of cardiac arrest on March 23, 1988." The treating physicians agreed. The district court also ruled that the Evanses produced no admissible evidence as to causation, the only evidence

being the affidavit of Mr. Evans in which he states his belief that his wife's death was proximately caused by the incidents of April 15th. The district court characterized the affidavit as "not valid medical testimony." We agree with the district court.

Under Rule 56(e) of the Idaho Rules of Civil Procedure, the affidavits supporting and opposing summary judgment "shall be made on personal knowledge, and shall set forth such facts as would be admissible in evidence...." The district court held that Mr. Evans's affidavit containing his lay opinion that the events on April 15, 1987, caused Mrs. Evans' death eleven months later was not admissible evidence.

Under the Idaho Rules of Evidence Rules 701 and 702, and the decisions of this Court, the trial court has discretion in determining whether to allow a lay witness to express an opinion relating to causation.

The relevant Idaho Rules of Evidence are:

**Rule 701. Opinion testimony by lay witness.**—If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue.

**Rule 702. Testimony by experts.**—If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Since Mr. Evans was not testifying as an expert, I.R.E. 701 is the applicable rule. It provides that a trial court may permit the opinion evidence of a non-expert if the opinion evidence "is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue." The decisions of this Court and the Court

of Appeals, both before and after the adoption of the Rules of Evidence in 1985, have held that the admission of opinion testimony, particularly that of non-expert witnesses, rests in the sound discretion of the trial judge. *State v. Cutler*, 94 Idaho 295, 486 P.2d 1008 (1971); *State v. Hopkins*, 113 Idaho 679, 747 P.2d 88 (Ct.App.1987); *State v. Curry*, 103 Idaho 332, 647 P.2d 788 (Ct.App.1982). I.R.E. 701 incorporates the standards from our earlier cases limiting lay opinion evidence to that which is "(a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue." The issue which the trial court had to decide in this case was whether the lay opinion of Mr. Evans that his wife's cardiac arrest was caused by the stress resulting from this event which occurred more than eleven months prior was "rationally based on the perception of the witness," particularly in the face of the testimony of three physicians who testified that there was no causal relationship whatsoever between the events that occurred at the Evanses' home on April 15, 1987, and Mrs. Evans' death as a result of cardiac arrest on March 23, 1988. Dr. Donald K. Stott, a cardiologist, testified that, "It is entirely unreasonable to even suggest any connection whatsoever between these events and the [cardiac arrest]." While our prior cases have not directly addressed the question of whether a lay person may offer opinion testimony as to the ultimate cause of death, we have held in *Flowerdew v. Warner*, 90 Idaho 164, 409 P.2d 110 (1965), that lay opinion testimony was inadmissible to prove the cause of a plaintiff's medical condition.

A majority of the states which have addressed this matter have held that:

> Where the subject matter regarding the cause of disease, injury, or death of a person is wholly scientific or so far removed from the usual and ordinary experience of the average person that expert knowledge is essential to the formation of an intelligent opinion, only an expert can competently give opinion evidence as

to the cause of death, disease or physical condition.

31A Am.Jur.2d, Expert & Opinion Evidence § 207; *Collette v. Collette*, 418 A.2d 891 (Conn.1979); *Galindo v. Riddell, Inc.*, 107 Ill.App.3d 139, 62 Ill.Dec. 849, 437 N.E.2d 376 (1982); *Woods v. Brumlop*, 71 N.M. 221, 377 P.2d 520 (1962).

We conclude that the trial court did not err in concluding that the lay opinion of Mr. Evans that his wife's death by cardiac arrest was caused by the events of April 15, 1987, was not admissible under I.R.E. 701 and the prior decisions of this Court and the Court of Appeals. Accordingly, if there was a wrongful death claim pled, the trial court did not err in dismissing it.

## II

### SURVIVAL OF MRS. EVANS' CLAIM

■ Mrs. Evans' original complaint alleged claims against the Twin Falls deputies alleging, *inter alia*, false arrest, assault and battery, and violation of her constitutional rights under 42 U.S.C. § 1983. After her death, an amended complaint was filed, purportedly joining "the Estate of L. Juanita Evans." [4] The district court dismissed these claims based on this Court's decision in *Vulk v. Haley*, 112 Idaho 855, 736 P.2d 1309 (1987), holding that the claims did not survive the death of Mrs. Evans. The court quoted from the *Vulk* case that, "The philosophy, simply stated, is that an injured person who is dead cannot benefit from an award for *his* pain and suffering." 112 Idaho at 859, 855 P.2d at 1313. On appeal, Mr. Evans asserts that his wife's claims do survive and can be asserted by her estate, pointing to our holding in *Doggett v. Boiler Engineering & Supply Co.*, 93 Idaho 888, 477 P.2d 511 (1970), to support his position. In *Doggett* we stated:

> "We hold therefore that, to the extent that there has been alleged, and the appellant can prove, damage to the community by way of depletion of community assets, reduction of the ability of the community to earn income, costs and ex-

4. See footnote 1.

penses chargeable against community property, *and the general damages for pain and suffering,* such cause of action survives the death of the deceased spouse...."

93 Idaho at 892, 477 P.2d at 515 (emphasis added). The district court rejected this argument based on our more recent holding in *Vulk v. Haley,* 112 Idaho 855, 736 P.2d 1309 (1987), wherein we stated: "Therefore, an action for pain and suffering does not survive the death of the injured." 112 Idaho at 859, 736 P.2d at 1313.

At common law if the victim of a tort died before he recovered a judgment, the victim's right of action also died. *See* Prosser & Keeton on Torts, § 125(a) (5th ed. 1984); *Vulk v. Haley,* 112 Idaho 855, 736 P.2d 1309 (1987); *Moon v. Bullock,* 65 Idaho 594, 151 P.2d 765 (1944); *Russell v. Cox,* 65 Idaho 534, 148 P.2d 221 (1944). Furthermore, at common law where a person's death was caused by the wrongful act of another, the relatives and dependents of the victim had no cause of action of their own. *See* The Genesis of Wrongful Death, 17 Stanford L.Rev. 1043 (1964); *Vulk v. Haley,* 112 Idaho 855, 736 P.2d 1309 (1987); *Volk v. Baldazo,* 103 Idaho 570, 573, 651 P.2d 11, 14 (1982) ("We deem it well settled that statutes authorizing actions for wrongful death are remedial in nature, designed to alleviate the harsh rule of common law that if an injured person died, his cause of action ceases to exist."). I.C. § 73–116 provides that the rules of the common law are in effect in Idaho unless modified by other legislative enactments. *See State v. Iverson,* 79 Idaho 25, 310 P.2d 803 (1957).

The common law rule precluding any claim on behalf of the relatives or dependents of a deceased person was modified in 1881 by the enactment of I.C. § 5–311, which provided:

**5–311. Action for wrongful death.—** When the death of a person ... is caused by the wrongful act or neglect of another, his heirs or personal representatives may maintain an action for damages against the person causing the death; ....

Statutes similar to I.C. § 5–311 have been enacted in nearly every other state and were modeled after the Lord Campbell's Act, adopted in England in 1846. *See* McCormick, Damages § 93 (1982).[5]

However, the Idaho legislature has not enacted any statute specifically abrogating the common law rule of non-survival of causes of action *ex delicto* in cases where the victim dies before recovery. In *Vulk v. Haley,* 112 Idaho 855, 859, 736 P.2d 1309, 1313 (1987), the case relied upon by the trial court in dismissing the survival claim of the estate of Mrs. Evans, the Court held that tort actions "for pain and suffering [do] not survive the death of the injured." Appellant nevertheless argues that the legislature has abrogated the common law rule of non-survivability of tort actions in a husband-wife community property setting. Thus, appellant argues that the decision of this Court in *Doggett v. Boiler Engineering & Supply Co.,* 93 Idaho 888, 477 P.2d 511 (1970), modified the common law rule in a community property setting, such as is alleged to have existed between Mr. and Mrs. Evans in this case. *Doggett* did, indeed, find an implied modification of the common law rule based upon I.C. § 32–906, which statute the Court in *Doggett* assumed mandated that damages for pain and suffering were community property, and therefore the surviving spouse had a property interest in that pain and suffering and, to that extent, the claim for pain and suffering survived the death of the injured party because the claim was also the property of the surviving spouse. The Court in *Doggett* purported to overrule the contrary case of *Moon v. Bullock, supra,* stating that "to the extent that [*Moon*] suggests that an action *ex delicto* abates upon the death of a plaintiff *in a case such as presented here,* it is overruled." 93 Idaho at 890, 477 P.2d at 513 (emphasis added.)

---

**5.** In addition, at common law if the tortfeasor died the victim's right of action died with him. This rule has also been abrogated in Idaho by the enactment of I.C. § 5–327, which provides,

"Causes of action arising out of an injury to the person or property, or death, caused by the wrongful act or negligence of another ... shall not abate upon the death of the wrongdoer...."

However, the Court in *Doggett* incorrectly assumed that "general damages for pain and suffering" are a community asset in which the surviving spouse has a property interest, and therefore upon the death of the injured spouse does not abate. In the subsequent case of *Rogers v. Yellowstone Park Co.*, 97 Idaho 14, 20, 539 P.2d 566, 572 (1975), this Court held that "general damages for pain and suffering and emotional distress [are] the injured spouse's separate property," not community property. The Court in *Rogers* overruled, *sub silentio*, that part of the *Doggett* opinion which held that I.C. § 32–906 provided that pain and suffering was community property rather than the separate property of the injured spouse. The *Rogers* case rejected the rationale of the *Doggett* decision, and accordingly, *Doggett* does not support appellant's claim. As this Court recognized in *Vulk v. Haley*, 112 Idaho 855, 859, 736 P.2d 1309, 1313 (1987), "[A]n action for pain and suffering does not survive the death of the injured."

■ Consequently, the district court did not err in applying our recent decision in *Vulk v. Haley*, and dismissing any survival claim of the estate of Mrs. Evans on the basis that her claims did not survive her death.[6]

### III

### 42 U.S.C. § 1983 CLAIMS

■ A. *Claim of Mr. Evans*. The district court stated that Mr. Evans had not produced any evidence to counter the affidavits supporting the defendants' motion for summary judgment which demonstrated that none of Mr. Evans' constitutional rights had been violated, and therefore there was no basis for a 42 U.S.C. § 1983 claim on behalf of Mr. Evans. The trial court specifically found that the defendants were validly on the premises with a writ of execution to serve, and that Mr. Evans' own deposition established that he did not try to leave his house, nor did the deputies tell him that he could not leave his house, nor did they restrain him. The trial court concluded that none of his constitutional rights were violated. We have reviewed the record and agree that Mr. Evans has not established any evidence raising a triable issue of fact that his constitutional rights were violated. Accordingly, we affirm the trial court's dismissal of Mr. Evans' 1983 claim.

■ B. *Claim of Mrs. Evans*. Before we consider the merits of this claim it is necessary to decide whether the constitutional claim survives Mrs. Evans' death; if not, then our consideration of the merits of such claim is thereby obviated.

42 U.S.C. § 1983 creates a cause of action for deprivation of federal statutory or constitutional rights. The statute reads in pertinent part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes

---

6. The district court further ruled in the alternative that even if such claim survived Mrs. Evans' death, they were barred under the exceptions to liability provisions of I.C. § 6–904(3) as arising out of an assault and battery. The pertinent provisions of that statute are as follows:

**6–904. Exceptions to governmental liability.**—A governmental entity and its employees while acting within the course and scope of their employment and without malice or criminal intent shall not be liable for any claim which:

.    .    .    .    .

3. Arises out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights.

On appeal, Mr. Evans argues that the exception does not apply because there was a question of fact as to whether Officer Jensen acted with "malice" toward Mrs. Evans stemming from several unrelated incidents in the distant past and also inferred by his conduct toward Mrs. Evans on April 15, 1987. As we stated in *Anderson v. City of Pocatello*, 112 Idaho 176, 731 P.2d 171 (1987), malice within the definition of the Tort Claims Act means "actual malice" which requires a wrongful act without justification combined with ill will. The record before the district court at the time the summary judgment was granted contains no evidence that the defendants acted with the requisite malice or criminal intent to circumvent the exceptions to liability contained in I.C. § 6–904(3). We therefore affirm the district court's ruling on the issue of immunity.

to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

By its very terms, the statute grants a cause of action "to the party injured." Thus, it is a *personal* action. The United States Supreme Court addressed the issue of survivability in *Robertson v. Wegmann*, 436 U.S. 584, 98 S.Ct. 1991, 56 L.Ed.2d 554 (1978), and acknowledged that determination of the applicable survivorship rule for actions brought under 42 U.S.C. § 1983, was governed by 42 U.S.C. § 1988.[7] The Court in *Robertson* paraphrased the statute, stating that "where federal law is thus deficient, § 1988 instructs us to turn to the common law, as modified and changed by the Constitution and statutes of the (forum) state so long as these are not inconsistent with the Constitution and laws of the United States." 436 U.S. at 587, 98 S.Ct. at 1994. The Court in *Robertson v. Wegmann* found that while the common law had been modified by statute in Louisiana to permit survival for the benefit of certain immediate heirs, the plaintiff Wegmann, the executor of the estate of Shaw, was not an heir, and therefore the Supreme Court held that the § 1983 action did not survive, and that Wegmann could not bring the § 1983 action.

As previously discussed in Part II, the common law has not been modified or changed in Idaho either by statute or the Constitution, and therefore the general common law rule that personal causes of action do not survive the death of the in-

jured party is the rule in Idaho. *Vulk v. Haley*, 112 Idaho 855, 736 P.2d 1309 (1987). The § 1983 cause of action, by virtue of the statute's express language, is a personal cause of action, actionable only by persons whose civil rights have been violated. Thus, under Idaho law Mrs. Evans' § 1983 action does not survive.

The application of the Idaho common law non-survivability rule is presumably the same as the federal common law rule and is not inconsistent with the Constitution and laws of the United States. The *Robertson* Court articulated the standard for determining when state law is inconsistent with federal law by stating:

"In resolving questions of inconsistency between state and federal law raised under § 1988, courts must look not only at particular federal statutes and constitutional provisions, but also at 'the policies expressed in (them).'"

436 U.S. at 590, 98 S.Ct. at 1995. The Court then stated that, for the purposes of the § 1988 analysis, state law cannot be deemed inconsistent with federal law merely because it results in a loss of the action. *Id.* The Court went on to identify the two principal policies underlying § 1983 as compensating those injured by an infringement of their civil rights and deterring official illegality. The Court concluded:

The goal of compensating those injured by a deprivation of rights provides no basis for requiring compensation of one who merely survives as the executor of the deceased's estate. And, given that most Louisiana actions survive the plaintiff's death, the fact that a particular action might abate surely would not adversely affect § 1983's rule in preventing

---

7. Title 42 U.S.C. § 1988 provides in pertinent part:

The jurisdiction in civil and criminal matters conferred on the district courts by the provisions of this chapter and Title 18, for the protection of all persons in the United States in their civil rights, and for their vindication, shall be exercised and enforced in conformity with the laws of the United States, so far as such laws are suitable to carry the same into effect; but in all cases where they are not adapted to the object, or are deficient in the provisions necessary to furnish suitable reme-

dies and punish offenses against law, *the common law, as modified and changed by the constitution and statutes of the State wherein the court having jurisdiction of such civil or criminal cause is held, so far as the same is not inconsistent with the Constitution and laws of the United States, shall be extended to and govern the said courts in the trial and disposition of the cause,* and, if it is of a criminal nature, in the infliction of punishment on the party found guilty. (Emphasis added.)

official illegality, at least in situations in which there is no claim that the *illegality* caused the plaintiff's death.

436 U.S. at 592, 98 S.Ct. at 1996.

Since we have previously concluded that the uncontradicted medical evidence in the record justifies the trial court's summary judgment against plaintiff's claim that the alleged illegality of the officers caused the plaintiff's death, this case is controlled by the decision of the United States Supreme Court in the *Robertson* case, and "the fact that a particular action might abate surely would not adversely affect § 1983's rule in preventing official illegality...." Accordingly, we conclude that under the standards set out by the United States Supreme Court in *Robertson v. Wegmann*, application of the Idaho common law precluding survivability of a tort claim is not inconsistent with 42 U.S.C. §§ 1983, 1988.[8] *See also Owens v. Okure*, 488 U.S. 235, 109 S.Ct. 573, 102 L.Ed.2d 594 (1989) (personal injury claims brought under 42 U.S.C. § 1983 are governed by the state's residual or general statute of limitations).

## IV

### NEGLIGENT OR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Finally, Mr. Evans' amended complaint might be construed as asserting either negligent or intentional infliction of emotional distress, although it is not clear from the complaint that these claims are raised. The trial court analyzed both these torts

and concluded that if a claim of negligent infliction of emotional distress was made, it was not supported by the record because, under *Gill v. Brown*, 107 Idaho 1137, 695 P.2d 1276 (Ct.App.1985), there must be some physical injury associated with the emotional distress.

■ Subsequent to the trial court's decision, in our most recent case of *Czaplicki v. Gooding Joint School Dist.*, 116 Idaho 326, 775 P.2d 640 (1989), we again held that in order to allege and prove a claim for negligent infliction of emotional distress there must be both an allegation and proof that a party claiming negligent infliction of emotional distress has suffered a physical injury, *i.e.*, a physical manifestation of an injury caused by the negligently inflicted emotional distress. In *Czaplicki* we said, "It is beyond dispute that in Idaho no cause of action for negligent infliction of emotional distress will arise where there is no physical injury to the plaintiff." 116 Idaho at 332, 775 P.2d at 646. In *Czaplicki* both the plaintiff's complaint and affidavit "describe[d] various emotional injuries that have manifested themselves in physical symptoms such as severe headaches, occasional suicidal thoughts, sleep disorders, reduced libido, fatigue, stomach pains and loss of appetite." 116 Idaho at 332, 775 P.2d at 646. The Court in *Czaplicki* held that those allegations were sufficient to constitute an allegation of a manifestation of a physical injury to raise an issue of fact which required a trial on that issue. In this case, the "affidavit"[9] of Mr. Evans, in

**8.** Because we find that if Mrs. Evans had a § 1983 action it did not survive her death, it is unnecessary to address whether or not Mrs. Evans had such a § 1983 action. The trial court found that, "the alleged grabbing and shaking of Mrs. Evans does not arise to this constitutional level. Looking at this point most favorably to the plaintiffs, there are no facts to show that Mrs. Evans was maliciously or sadistically beaten. At the most, she was allegedly grabbed and shaken." Quoting from our decision in *Doe v. Durtschi*, 110 Idaho 466, 473, 716 P.2d 1238, 1295 (1986), the trial court stated, " '[A] plaintiff must allege sufficient facts which, if proven, would *demonstrate that the governmental entity should have reasonably anticipated that one of their employees would commit an intentional tort.'* The plaintiffs have not alleged any facts

pertaining to Twin Falls County. The plaintiffs have not alleged the existence of any policy of Twin Falls County that was the cause of the plaintiffs' damages. 'A municipality is not liable under § 1983, unless the constitutional violation "implements or executes a policy statement, ordinance, regulation or decision officially adopted and promulgated by the body's officers." ' *Herrera v. Conner*, 111 Idaho 1012, [1019], 729 P.2d 1075 [1082] (Ct.App.1987) [citation omitted]. Plaintiff has not offered anything to show that such a policy existed in Twin Falls County."

**9.** The "affidavit" filed by Mr. Evans, while in partial affidavit form, is not subscribed and sworn to as an oath or affirmation, as required of an affidavit. I.C. § 51–109. Rather, the sig-

opposition to the motion for summary judgment, described in some detail the effect which the conduct of the defendant had upon his wife, but makes no mention of any emotional distress to Mr. Evans, nor any physical manifestation of a physical injury resulting to Mr. Evans as a result of any emotional distress negligently inflicted upon him as a result of the defendants' conduct. The only allegation in the complaint of a physical condition which could be construed as a "physical injury" within the meaning of our decision in *Czaplicki* is Mr. Evans' allegation that he required medical treatment and medication for his elevated blood pressure allegedly caused from emotional distress. However, there was a substantial amount of medical testimony in the record all of which clearly explained that Mr. Evans' high blood pressure condition preceded the events in question and had no relationship to the incident in this case. In his own deposition Mr. Evans testified that he had had high blood pressure for many years before the incident in question:

A. No. I have got high blood pressure.

Q. When was that diagnosed?

A. Oh, the railroad claimed it was years ago, a little bit high; but they never did have me do anything for it. But since I have been back up here, I take pills for it.

Q. When did you first see a physician here for that condition?

A. I think I went to Gibney first, I believe. Now, I don't know what year that was. It would have been in the 60's.

These facts are in turn corroborated by the testimony of Dr. Spafford, Mr. Evans' treating physician. In his deposition, Dr. Spafford testified to Evans' high blood pressure which existed before the events in question:

A. I saw Mr. Evans 11–12–86. He was transferring from Dr. Virgil Telford, who had retired; and he wanted to follow up on his blood pressure.

Q. Is it accurate to say, that as of the date that he transferred to you on 11–12–86, that he had an existing blood pressure problem?

A. Yes.

Dr. Spafford also testified in his deposition that before the events in question he had urged Mr. Evans to lose weight, and to continue his medication for high blood pressure on a daily basis, and to get a blood pressure check every two weeks, and an appointment in two months or so as needed. Dr. Spafford went on to testify that Mr. Evans did not follow up on his appointments as recommended to get his blood pressure checked and did not see him again until August 3, 1987, over three months after the incidents on April 15, 1987, which form the basis for Evans' claim. Finally, when asked if he could render an opinion regarding the potential connection between Mr. Evans' physical condition and the alleged incidents on April 15, Dr. Spafford stated: "No, I couldn't make a connection." Hence, in Dr. Spafford's opinion, Mr. Evans' blood pressure was not proximately caused by the events of April 15, 1987. There is, therefore, no evidence in this record to support the general allegation in the amended complaint that Mr. Evans' high blood pressure was caused by the incidents on April 15, 1987. Mr. Evans' opinion on that medical issue would in any event be inadmissible under Rule 701 of the Idaho Rules of Evidence and our cases interpreting that rule. *Flowerdew v. Warner*, 90 Idaho 164, 409 P.2d 110 (1965). Under Rule 56(e) of the Idaho Rules of Civil Procedure, the affidavits opposing summary judgment "shall be made on personal knowledge, and shall set forth such facts as would be admissible in evidence...." We therefore agree that the district court did not err in granting summary judgment on Mr. Evans' claim for negligent infliction of emotional distress.

Regarding the claim that Mr. Evans' amended complaint asserted a claim that the defendants were guilty of inten-

---

nature of Mr. Evans was merely acknowledged by the notary public in the manner required for the acknowledgment of signatures on deeds for recording under I.C. § 55–710. Thus, the facts stated in the "affidavit" are not under oath as required by I.R.C.P. 56(e).

tional infliction of emotional distress, the trial court reviewed the four elements necessary to establish a claim of intentional infliction of emotional distress as set out in *Davis v. Gage*, 106 Idaho 735, 682 P.2d 1282 (Ct.App.1984), and concluded that "the record did not establish that all four elements have been met." We agree with the trial court that the record does not support a claim of intentional infliction of emotional distress. The four elements which a plaintiff must show to be able to recover for intentional infliction of emotional distress are: (1) the conduct must be intentional or reckless; (2) the conduct must be extreme and outrageous; (3) there must be a causal connection between the wrongful conduct and the emotional distress; and (4) the emotional distress must be severe. *Davis v. Gage, supra.* The Restatement (Second) of Torts, which was instrumental in establishing the tort of intentional infliction of emotional distress, describes in Section 46, comment j (1965), how severe the emotional distress must be before it is actionable:

> The rule stated in this Section applies only where the emotional distress has in fact resulted, and where it is severe. Emotional distress passes under various names, such as mental suffering, mental anguish, mental or nervous shock, or the like. It includes all highly unpleasant mental reactions, such as fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, worry, and nausea. *It is only where it is extreme that the liability arises.* Complete emotional tranquillity is seldom attainable in this world, and some degree of transient and trivial emotional distress is a part of the price of living among people. The law intervenes only where the distress inflicted is so severe that no reasonable man could be expected to endure it. The intensity and the duration of the distress are factors to be considered in determining its severity. *Severe distress must be proved;* but in many cases the extreme and outrageous character of the defendant's conduct is in itself important evidence that the distress has existed. (Emphasis added.)

As the trial court observed, "The physical manifestations [high blood pressure] complained of were present before the incident on April 15, 1987." Furthermore, the trial court found, "There are no facts that show the required severity," even assuming that there was a causal connection between the alleged wrongful conduct and the physical manifestations of emotional distress complained of. Accordingly, the trial court did not err when it concluded that "the facts and records do not indicate that Mr. Evans suffered any actionable emotional distress."

The judgment of the district court is affirmed. Costs to respondents. No attorney fees allowed.

JOHNSON, BOYLE and McDEVITT, JJ., concur.

BISTLINE, Justice, dissenting.

I must dissent from that portion of the majority opinion which holds that Mrs. Evans § 1983 action does not survive her death. The majority states that "this case is controlled by the decision of the United States Supreme Court in the *Robertson [v. Wegmann]* case, and 'the fact that a particular action might abate surely would not adversely affect § 1983's rule in preventing official illegality....'" Op. at 218, 796 P.2d at 95 (1990). Unfortunately, the majority has taken this quote from *Robertson* completely out of context. The result is that the majority's holding is skewed one-hundred eighty degrees in the wrong direction. In *Robertson* the United States Supreme Court held:

> Despite the broad sweep of § 1983, we can find nothing in the statute or its underlying policies to indicate that a state law causing abatement of a particular action should *invariably* be ignored in favor of a rule of *absolute* survivorship. The policies underlying § 1983 include compensation of persons injured by deprivation of federal rights and prevention of abuses of power by those acting under color of state law.... No claim is made here that Louisiana's survivorship laws are in general inconsistent with these policies, *and indeed most Louisi-*

*ana actions survive the plaintiff's death.* See La.Code Civ.Proc.Ann., Art. 428 (West 1960); La.Civ.Code Ann., Art. 2315 (West 1971). *Moreover, certain types of actions that would abate automatically on the plaintiff's death in many States—for example, actions for defamation and malicious prosecution—would apparently survive in Louisiana.* In actions other than those for damage to property however, Louisiana does not allow the deceased's personal representative to be substituted as plaintiff; rather, the action survives only in favor of a *spouse,* children, parents, or siblings.... But surely few persons are not survived by one of these close relatives, and in any event no contention is made here that Louisiana's decision to restrict certain survivorship rights in this manner is an unreasonable one.

It is therefore difficult to see how any of § 1983's policies would be undermined if Shaw's action were to abate. The goal of compensating those injured by a deprivation of rights provides no basis for requiring compensation of one who is merely suing as the executor of the deceased's estate. And, *given that most Louisiana actions survive the plaintiff's death,* the fact that a particular action might abate surely would not adversely affect § 1983's role in preventing official illegality, at least in situations in which there is no claim that the illegality caused the plaintiff's death. A state official contemplating illegal activities must always be prepared to face the prospect of a § 1983 action being filed against him. In light of this prospect, even an official aware of the intricacies of Louisiana survivorship law would hardly be influenced in his behavior by its provisions.

It is true that § 1983 provides 'a uniquely federal remedy against incursions under the claimed authority of state law upon rights secured by the Constitution and laws of the Nation.' *Mitchum v. Foster, supra,* 407 U.S. [225] at 239, 92 S.Ct. [2151] at 2160 [32 L.Ed.2d 705 (1972) ]. That a federal remedy should be available, however, does not mean that a § 1983 plaintiff (or his representative) must be allowed to continue an action in disregard of the state law to which § 1988 refers us. A state statute cannot be considered 'inconsistent' with federal law merely because the statute causes the plaintiff to lose the litigation. If success of the § 1983 action were the *only* benchmark, there would be no reason at all to look to state law, for the appropriate rule would then always be the one favoring the plaintiff, and its source would be essentially irrelevant. But § 1988 quite clearly instructs us to refer to state statutes; it does not say that state law is to be accepted or rejected based *solely* on which side is advantaged thereby. *Under the circumstances presented here,* the fact that Shaw was not survived by one of several close relatives should not itself be sufficient to cause the Louisiana survivorship provisions to be deemed 'inconsistent with the Constitution and laws of the United States.' 42 U.S.C. § 1988.

*Our holding today is a narrow one, limited to situations in which no claim is made that state law generally is inhospitable to survival of § 1983 actions and in which the particular application of state survivorship law, while it may cause abatement of the action, has no independent adverse effect on the policies underlying § 1983. A different situation might well be presented, as the District Court noted, if state law 'did not provide for survival of any tort actions'* [*Shaw v. Garrison*], 391 F.Supp. [1353], at 1363 [ (E.D.La.1975) ], *or if it significantly restricted the types of actions that survive....* We intimate no view, moreover, about whether abatement based on state law could be allowed in a situation in which deprivation of federal rights caused death....

Here it is agreed that Shaw's death was not caused by the deprivation of rights for which he sued under § 1983, and Louisiana law provides for the survival of most tort actions. Respondent's only complaint about Louisiana law is that it would cause Shaw's action to abate. We conclude that the mere fact of abatement of a particular lawsuit is

not sufficient ground to declare state law 'inconsistent' with federal law.

*Robertson v. Wegmann,* 436 U.S. 584, 590–95, 98 S.Ct. 1991, 1995–97, 56 L.Ed.2d 554 (1978) (emphasis added) (footnotes and citations omitted).

The case before this Court is precisely the kind of "different situation" which the Supreme Court indicated would yield a different result than that reached in *Robertson.* As the majority has clearly stated, the general rule in Idaho is that actions personal to an individual do not survive that individual's death. And, states the majority, violations of constitutional rights for which compensation is sought under § 1983 are personal actions. It is therefore eminently reasonable to state that Idaho law has "significantly restricted the types of actions that survive." *Robertson,* 436 U.S. at 594, 98 S.Ct. at 1997. The rationales which were offered by the *Robertson* Court to justify its "narrow" holding were based on the liberality of Louisiana's survivorship statutes. Those rationales simply do not apply in Idaho, where the harsh and unforgiving rule of the common law regarding survival of actions still prevails. It is quite likely that the United States Supreme Court would find that Mrs. Evans' § 1983 action should survive her death. This Court should have the jurisprudential foresight to rule likewise.

## ON DENIAL OF PETITION FOR REHEARING

BISTLINE, Justice, dissenting on denial of petition for rehearing.

The Court, by the same four to one vote which resulted in a majority opinion, has now brushed aside the Evans' petition for rehearing, or, alternatively, a modification which would erase this Court's endorsement of what is aptly referred to as "nothing short of an armed invasion" and "a show of force" amounting to an invasion of privacy.

The brief which has been presented to us on behalf of Mr. Evans is compelling, thus making it difficult to understand the ready denial, especially where the Court tenders not one word of explanation or reasoning.

It is indeed disappointing to see the Court moving backward when it has the capability to strive for, and achieve the ends of justice in all cases, not just a select few. Attached for the perusal of a candid bench and bar is the succinct, eloquent brief to which the Court turns a deaf ear and an unseeing eye.

## BRIEF IN SUPPORT OF PETITION FOR REHEARING OR, IN THE ALTERNATIVE, FOR EXTRAORDINARY APPELLATE PROCEDURE

It is feared that the Court has overlooked a very important procedural error committed by the District Court. No mention of this procedural error, one way or the other, is noted in the Court's Opinion but, if the Court agrees that this error did occur, the case should be remanded and not affirmed.

A pivotal fact on which the Court did rely was Dr. Stott's opinion formed after reading the medical records of Mrs. Evans, that her death could not have been caused by the incident which forms the basis of this action.

The Court's Opinion at p. 91, refers to Dr. Stott's opinion and cites it with approval reflecting the great esteem which the law reserves for practitioners of the healing arts. In truth, Dr. Stott's opinion becomes one of the pivotal aspects of this Court's decision. Dr. Stott has rendered his opinion and it counters the opinion of the husband of the deceased. The Court has ruled that we do not concern ourselves with that opinion because it is only a laymen's opinion grounded only upon 30 years experience with this deceased woman. A husband who has caressed, loved, shared with, and intimately known the deceased woman for more than 30 years is of absolutely no importance and the holding of the case so indicates. His opinion pales into nothing when set against the conclusion of a physician who did not witness the triggering event, who did not know the deceased woman, who did not interview the witnesses or read the depositions of the witnesses or converse with or read the

depositions of the examining or treating physicians, who did not examine the body, who had no autopsy report to read, but who did read some medical records kindly set before him by Defendant's counsel.

Since this important, pivotal, opinion of Dr. Stott comes to us by way of an Affidavit, why, the Court might ask, is there no deposition of Dr. Stott? Why is there no cross-examination of Dr. Stott? Why does this court not have a countervailing affidavit from a physician?

The answer is found at p. 21 of Appellant's Brief. The reason why Dr. Stott's opinion stands like the Colossus of Rhoades over this case, an uncontradicted beacon of truth and light, is that it was not timely submitted by Defendant's counsel. Discovery was to cut off on January 13, 1989. Two days before and after office hours, some 47 witnesses were identified by the Defendants by way of supplemental answers to interrogatories. The response of plaintiffs was to move the Court to exclude all of the testimony of all of these suddenly identified witnesses, one of whom was Dr. Stott. That Motion in Limine and 13–page supporting brief was timely filed and noticed for hearing before the Court for January 30th. But the Trial Court refused to take up that motion.

Dr. Stott's opinion by way of Affidavit was not filed with the Court until the date of January 17, 1989, which was only 13 days before the argument for Summary Judgment. A Motion to Strike the Affidavit was made during oral argument by Plaintiff's counsel (TR 43 II. 2–5), but the trial court never got around to hearing that motion or the Motion in Limine, instead having an off-again-on-again approach to the hearing on the Motion for Summary Judgment which literally lasted all day having been interrupted by many delays. When the Court summarily stalked off the bench at 5:00 o'clock stating that there were some things to attend to, the Motions relative to Dr. Stott's evidence were still not addressed.

The objection to Dr. Stott's offer of evidence was filed primarily because the Plaintiffs could not cross-examine nor file a counter-affidavit. Rule 56(c) seems to be quite clear in stating that Affidavits shall be served at least 28 days before the time fixed for the hearing. The reason for this rule is also apparent. That is so the adverse party can serve opposing affidavits at least 14 days prior to the date of the hearing. If observed, this might save everyone some time and trouble because questions of fact would appear and then obviate the necessity for argument on Rule 56.

If we take away from the record the Affidavit of Dr. Stott, we are not left with any valid medical opinion that the death of Mrs. Evans was not caused by the incident. The depositions of Dr. Spafford, Dr. Swartling, and Dr. Bontrager have been reviewed and none state that there is no chance of a causal connection between the incident and the death of Mrs. Evans. Dr. Spafford comes closest at pps. 25 and 26 of his deposition but he never does state that the death was *not* connected. He *does* say at pps. 28–29 that stress can cause heart damage. The point is, however, that without Dr. Stott's affidavit, Defendants have zero evidence on which to base their Rule 56 motion and that does not seem to have been taken into account by the Court in its opinion.

The second reason for the Petition for Rehearing is to argue, if indeed the Court needs argument, on the case of *Robertson v. Wegmann*, 436 U.S. 584, 98 S.Ct. 1991, 56 L.Ed.2d 554 (1978). It is clear from the portion of that case cited by Justice Bistline that the majority opinion is reflective of a misreading of the *Robertson* decision. The U.S. Supreme Court's opinion itself states, "a different situation might well be presented, as the District Court noted, if State law 'did not provide for survival of any tort actions' [*Shaw v. Garrison*], 391 F.Supp. [1353] at 1363 [ (E.D.La.1975) ], or if it significantly restricted the types of actions that survive...." It is quite likely that the United States Supreme Court would find that Mrs. Evans' § 1983 action should survive her death and indeed, this Court should likewise rule.

The holding of this Court does seem to be anomalous to fundamental notions of fair play and civil liberties. What public policies are advanced by allowing police officers to violate the civil rights of a citizen and to pay for those violations of civil rights if the citizen lives but fortuitously escape payment if the citizen dies? What possible public policy is advanced by allowing the wrongdoer to escape without paying for the wrong that he does?

Hypothetically, if there were a citizen who has no heirs, is not this Court stating to law enforcement officers within the state, "shoot to kill," because if they are successful in their violation of civil and constitutional rights, the cause of action abates upon the death and the activities of the police officers never have to be justified or accounted for. What possible public policy is advanced by this interpretation of the law? Why should death cause an abatement in a civil rights case where the law attempts to proscribe behavior, not necessarily to compensate the victim.

Clearly, § 1983 beginning with *Monroe v. Pape,* and down to the present day indicates that law enforcement agencies are to be held accountable for their violations of the Constitution or statutes which protect property or liberty interests. What possible public policy is advanced by this Court's ruling that a cause of action abates with the death of the person who was victimized by illegal and unconstitutional police activity? This writer can think of none. None were offered by the Court in its decision. The decision is clear but the foundation for it or the metaphysics involved are not articulated.

Finally, the Court seems to ground its decision upon the fact that the officers were "lawfully" serving a writ of execution. Perhaps this point was lost on the Court and bears repeating: there were six police officers that came with numerous police vehicles in order to surround this farm house and seize farm equipment. They would not take a check for the judgment but ultimately forced the farm wife to travel into town to get a certified check from her banker. When she handed over that certified check, then the officer who received the check radioed to the others at the farm and they then, and only then, vacated the premises.

This is nothing short of an armed invasion. It was an unreasonable show of force and violates the privacy interest of the First Amendment and the liberty interest of the Fourteenth Amendment. Perhaps the Court has not appreciated the argument being made here. If it has appreciated the argument and finds that it is entirely appropriate for such a show of force and that this does not even present a jury question as to whether the privacy or property interests of the surviving Plaintiff, Mr. Evans, were violated, then it is submitted that this Court has passed up a good opportunity to protect Idaho citizens in their homes against unreasonable police conduct. Why do we not submit a case like this to the citizens of Twin Falls County for their verdict? The assumption which underlies this Court's decision seems to state that as long as there is a valid writ in the hand of the policeman he cannot violate the civil rights of a citizen with the other. No case stands for that proposition and it is hoped that this decision will be modified accordingly.