775 P.2d 640

**Russell CZAPLICKI and Rose Czaplicki, husband and wife, individually and as natural parents of Garrett Czaplicki, a deceased minor, Plaintiffs–Appellants,**

v.

**GOODING JOINT SCHOOL DISTRICT NO. 231; Richard Conley, and individual, Gilbert E. Schmidt, individually and Gooding County Ambulance Service, and Does I through X, inclusive, persons or entities at present unknown, Defendants–Respondents.**

No. 17140.

Supreme Court of Idaho.

May 24, 1989.

Rehearing Denied July 14, 1989.

Evans, Keane, Koontz, Boyd, Simko & Ripley, Boise, for plaintiffs-appellants. Rex Blackburn argued.

Nelson, Rosholt, Robertson, Tolman & Tucker, Twin Falls, for defendants-respondents. George R. Bevan argued.

HUNTLEY, Justice.

### I. Incident

This case involves the tragic death of a six-year-old boy, Garrett Czaplicki, at school, because of an alleged needless delay in the provision of emergency medical care to him. The Czaplickis' appeal the district court's application of the "discretionary function" exception to various allegedly negligent acts of the defendants, particularly, the decision of school Principal Richard Conley to ignore the requests of Garrett's mother and school teacher for an ambulance and his having called off an ambulance that was being summoned, with no knowledge of Garrett's condition.

Garrett was enrolled in Gibbons Elementary School in Gooding, Idaho as a kindergarten student. On the day he died, Garrett stumbled and fell in the classroom. At approximately 2 p.m. on January 6, 1986, the kindergarten class lined up and walked across the playground to go to the school library in the main building. According to Becky Schoettger, Garrett's teacher, and school librarian Marie Klingler, Garrett appeared to be feeling fine and they did not notice anything unusual or abnormal about his behavior prior to and during his visit to the library. Sometime after 2:12 p.m.,

Rose Czaplicki who was present as a teacher's aide and who had stayed in the classroom to prepare some materials, heard people running. She heard some girls chanting, "we beat the boys, we beat the boys." and then she heard someone fall in the classroom. Rose turned and saw it was Garrett who had fallen. Garrett rose to his knees and Rose went to him and asked "Where does it hurt?" Garrett began to gesture with his right arm and then collapsed in unconsciousness into Rose's arms. Rose placed her arms under Garrett's arms and brought him out to the porch of the kindergarten.

Rose shouted to Garrett's teacher, Mrs. Schoettger, to get an ambulance and that Garrett was unconscious. Mrs. Schoettger ran to the office and requested the principal's secretary, Susan Bolton, to call an ambulance, advising her that one of her students had fallen and was "out." Mrs. Bolton picked up the phone to place the call and had placed it to her ear when she was stopped by Richard Conley, the principal. In an oral statement given by Mr. Conley to Farmers Insurance Agent Ric Rabe, in March 1986, Mr. Conley explained, ". . . [You] need to realize that Becky told Susan our secretary to call the ambulance and I told her not to." According to Mr. Conley, after instructing Mrs. Bolton not to complete her call for an ambulance, he then walked out of the office to where Garrett was, a distance he estimated to be 200 to 240 feet.

Rose Czaplicki was still waiting out on the porch of the kindergarten holding Garrett, who was still unconscious when Mr. Conley walked across the playground. Rose yelled, "Would you get over here." Susan Bolton, who had walked to a classroom across the hall, facing out onto the playground, saw Mrs. Czaplicki holding up Garrett who was in a "partially seated" position. His head had rolled forward on his chest and he appeared unconscious. Mrs. Bolton had opened a window in the classroom and she recalls Mrs. Czaplicki yelling for Mr. Conley to "hurry—he [Garrett] was really hurt."

Rose Czaplicki testified that Mr. Conley put up his arm and gestured to her as if to say "Calm down, don't get excited." As he got closer, Mr. Conley told Rose to put Garrett down. She lowered Garrett's head and shoulders to the ground and Mr. Conley stood over Garrett looking at him. Rose said, "Look at the way he's breathing," and according to Rose, Mr. Conley just stood there.

Mr. Conley testified that he tapped Garrett a number of times and called out his name, to which there was no response. Mr. Conley observed that Garrett was breathing, he picked up Garrett and said, "Well, let's get him someplace where it is warm." Rose told Mr. Conley that she would gather their things from the kindergarten room and Mr. Conley turned and started to walk back toward the main building. According to Rose, Mr. Conley then *walked* back to the school office with Garrett at the same pace he had walked out to them. Mr. Conley took Garrett into the office and placed him in a supine position on a bench.

The sheriff's dispatcher log indicates that Susan Bolton finally called to request an ambulance at 2:20 p.m. Tragically, that call would come one to two minutes too late to save Garrett Czaplicki. The entry for the call reads as follows:

Susan Bolton of Gooding Grade School, 934–4941 send an ambulance a little boy fell and hit his head. He is unconscious.

Susan Bolton placed a second call to the sheriff's dispatcher at 2:21 p.m., advising that the child was located in the school office.

Marie Klingler, the school librarian and a trained Emergency Medical Technician (EMT), was summoned to the office. She repositioned Garrett's head, covered him with a blanket, and elevated his legs. She testified that she observed that Garrett was breathing shallowly, and that every few seconds he would take a gasp of air. Mrs. Bolton described Garrett's breathing as sounding like a "baby with some phlegm"—irregular and in gasps. Mrs. Klingler testified that Garrett never completely stopped breathing while she was

present with him. Mr. Conley explained in his oral statement to the insurance agent in March 1986 that:

He [Garrett] was breathing, it was not normal respiration, but he was breathing when he was in the office laying down here, he was taking deep breaths, but sporadic. He was taking deep breaths, exhale, then there would be a pause before he would breathe again. And then he would [inhaling sound] [exhaling sound] take another.

At 2:27 p.m., Ambulance No. 52 radioed-in that it was at the grade school. Mr. Conley explained in his oral statement to the insurance agent that:

The last breath that I was aware that he [Garrett] took was as they [the EMTs] pulled up outside. When the ambulance was here he took another deep breath and that's the last deep breath that I remember him taking and I was beside him almost constantly since he was in the office, and I carried him inside.

EMT Gilbert Schmidt immediately performed an assessment of Garrett's condition and noted a complete absence of heartbeat and breathing in Garrett. The EMTs began cardiopulmonary resuscitation (CPR) and Garrett was transported to Gooding County Memorial Hospital, where he was later pronounced dead at 3:55 p.m. after resuscitative efforts failed.

The autopsy performed on Garrett Czaplicki revealed significant amounts of gastric contents in his lungs. Dr. Jane Bennett–Munro, the physician who performed the autopsy; Dr. Douglas Smith, the emergency room physician who treated Garrett; and plaintiff's experts, Dr. Robert R. Geiger, a board certified physician in the field of emergency medicine, and Dr. Herbert D. Ruttenberg, a board certified pediatric cardiologist, all testified in deposition that Garrett's death was due to respiratory failure. All of these physicians testified that the provision of appropriate, timely care by trained EMT(s) would have in all probability saved Garrett's life.

In deposition Dr. Geiger, who was responsible for developing emergency medi-cal treatment procedures for the state of Idaho, testified:

My opinion is that the child [Garrett] was a healthy child with no underlying problems, and he developed an airway problem. As a consequence to the airway problem, he was not getting enough oxygen to his blood, that the interval from the time the problem first started to the time treatment was initiated was too long, and that once treatment was initiated, it was not appropriate treatment, and had treatment been—appropriate treatment been given at the proper time, the child would be alive now.

Significantly, Dr. Geiger further testified that in his medical opinion and upon "looking at the facts, [had EMT assistance been provided] *even a minute sooner* most likely [it] would have saved [Garrett's] life."

Dr. Ruttenberg, who is on staff with the Primary Children's Medical Center in Salt Lake City, Utah, and is on the faculty of the University of Utah medical school, testified in deposition that in his medical opinion Garrett was "definitely resuscitatable" during the interval between his fall and the actual arrival of the ambulance. Dr. Ruttenberg observed:

Apparently, as soon as he collapsed, his mother was there and called for help and there was someone else, a teacher, I think, who ran back to get some help apparently to get an ambulance or EMT or something.

That request wasn't put through to the proper authorities, you know, and as I understand it, it was estimated a ten minute interval between the time he fell and was unconscious, going into coma, or whatever, but certainly not conscious until ₊ne EMT people got there and gave him mouth-to-mouth resuscitation.

I think any time before that he could have been helped. We call that resuscitation. I mean help is just assisted with his breathing, yeah, but nothing was done.

He, apparently, was just left alone on his back—which is not the good position to put a patient in. You have to put him on their stomach so that there can be drain-

ing if they vomit. On your back, you're guaranteed to get it in your lungs.

The plaintiffs attribute Garrett's death to the defendants, and have alleged that the Gooding Joint School District and Richard Conley, the principal, were negligent in the following particulars:

1) failure to secure and provide paramedics, first aid or other emergency assistance in a timely fashion;

2) failure to secure and provide competent or trained medical personnel;

3) failure to secure or provide necessary or reasonable supplies, material and equipment;

4) failure to provide instruction and/or supervision to persons responsible for medical assistance;

5) failure to establish, implement or administer adequate policies, practices or procedures regarding provision of properly trained supervised personnel;

6) failure of the school district to hire personnel trained in procedures for providing or securing medical assistance; and,

7) failure of the school district to train school district personnel to recognize and deal with emergency medical situations involving students.

## II. Immunity

The trial court erred in applying the "discretionary function" exception, I.C. § 6–904, as a basis for summary judgment in favor of the defendants. Idaho Code § 6–904(1) provides that:

A governmental entity and its employees while acting within the course and scope of their employment and without malice or criminal intent shall not be liable for any claim which:

1. Arises out of any act or omission of an employee of the governmental entity exercising ordinary care, in reliance upon

or the execution or performance of a statutory or regulatory function, whether or not the statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a governmental entity or employee thereof, whether or not the discretion be abused.

■ In ruling on a motion for summary judgment[1] based upon an immunity defense under the Idaho Tort Claims Act (ITCA), a trial judge should first determine whether the plaintiffs' allegations and supporting record generally state a cause of action for which "a private person or entity would be liable for money damages under the laws of the state of Idaho." *Walker v. Shoshone County*, 112 Idaho 991, 995, 739 P.2d 290, 294 (1987). The court must then determine whether an exception to liability under the ITCA shields the alleged misconduct from liability. In consideration of the initial inquiry as to whether a private individual or entity could be held liable under the facts alleged in the complaint, we essentially ask "is there such a tort under the laws of Idaho?" *Walker v. Shoshone County*, 112 Idaho 991, 995, 739 P.2d 290. In the present case, the existence of the common law tort of negligence answers that threshold inquiry in the affirmative.

■ The next stage in the analytical process applicable to such a motion requires evaluation of the availability of an exception to liability under the ITCA. The discretionary function exemption does not apply to negligent operational decision-making, nor does it shield the negligent implementation of a statute or a policy—exactly the situation alleged by the Czaplickis in their complaint and established by the evidence in this case. The Idaho Tort Claims Act makes a governmental entity liable for damages arising out of its own

---

1. Any motion for summary judgment is proper only when there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. I.R.C.P. 56(c). Standards applicable to summary judgment require the court to "liberally construe facts in the existing record in favor of the non-moving party, and to draw all reasonable inferences from

the record in favor of the non-moving party." *Doe v. Durtschi*, 110 Idaho 466, 469–470, 716 P.2d 1238, 1241–42 (1986). A motion for summary judgment must be denied if the evidence is such that conflicting inferences can be drawn therefrom, and if reasonable people might reach different conclusions. *Id.* at 470, 716 P.2d 1238.

negligent operational acts or omissions. *Doe v. Durtschi*, 110 Idaho 466, 471, 716 P.2d 1238. The Act is to be *liberally construed* with a view toward accomplishing its aims and purposes and attaining substantial justice. *Sterling v. Bloom*, 111 Idaho 211, 723 P.2d 755 (1986). The discretionary function exemption to liability applies only to government decisions entailing planning or policy formation, and "does not include functions which involve *any* element of choice, judgment, or ability to make responsible decisions; otherwise every function would fall within the exception." (Emphasis in original.) *Sterling*, 111 Idaho at 227, 723 P.2d 755 (citing *Johnson v. State*, 69 Cal.2d 782, 73 Cal.Rptr. 240, 245, 447 P.2d 352, 357 (1968); *Downs v. United States*, 522 F.2d 990, 995 (6th Cir.1975); *Wainscott v. State*, 642 P.2d 1355, 1356 (Alaska 1982); and, *Chandler Supply Co., Inc. v. City of Boise*, 104 Idaho 480, 482–83, 660 P.2d 1323, 1325–26 (1983)).

In *Ransom v. City of Garden City*, 113 Idaho 202, 743 P.2d 70 (1987), this Court held that the actions of a police officer in providing for the removal of a car from the public highways did not fall within the discretionary function exception. *Id.* at 206, 743 P.2d 70. Those same principles applied here conclusively establish that the defendants' actions and omissions do not fall within the discretionary function exception of I.C. § 6–904(1). Principal Conley's actions, rather than his status as principal, must be considered. *See Sterling*, 111 Idaho at 230, 723 P.2d 766; *Ransom*, 113 Idaho at 204, 743 P.2d at 72. Deciding to call off an ambulance and failing to render adequate first aid are not "basic policy decisions." While the Court in *Doe v. Durtschi*, 110 Idaho 466, 471, 716 P.2d 1238, focused upon the assault and battery exception to the Idaho Tort Claims Act, that case is nonetheless directly relevant to the instant case because here the negligence of the district is viewed in terms of the statutory duty delineated in I.C. § 33–512(4), which requires a school district to protect the health and morals of the students. The Gooding County School District had a policy entitled "District Liability Insurance," which stated the procedure that teachers were requested to follow in case of an accident to a student.

■ Even assuming that the school district made a "planning" decision to allow for the principal's involvement in calling for an ambulance, no immunity exists for the district's failure to assure that the principal is properly trained to determine whether an ambulance is needed or for principal Conley's uninformed, unilateral action in calling off an ambulance requested by both Garrett's mother and his teacher. Principal Conley had a statutory duty to act reasonably in the face of the foreseeable risk of harm to Garrett Czaplicki, as part of his duty to protect the health of all students for which he was responsible. It is Conley's decision with respect to how Garrett Czaplicki should be treated that is at issue. Reviewing that issue in light of the wealth of Idaho precedent unequivocally establishes that Conley's acts and omissions were operational and therefore subject to liability if they were not performed with ordinary care.

A private citizen or entity would be subject to liability for the negligence alleged by the Czaplickis against the District and Richard Conley. The discretionary function exception does not immunize the negligent implementation of policy, neither does it immunize negligent operational decision-making. This Court's mandate to strictly construe the discretionary function exception and to consider the ITCA's benevolent purpose was ignored by the district court. Principal Richard Conley cannot immunize himself and the District by negligently implementing his own or the District's "policies" and has no discretion not to follow the mandate of the legislature to protect the health and safety of his students. The decision to call off an ambulance, which had it not been called off would have arrived in time to save the life of Garrett Czaplicki, is *not* a policy decision but an operational decision subject to the standard of ordinary care set forth by the legislature in the ITCA. The question is whether Conley's actions constituted ordinary care. This a jury must decide.

The complaint contains various specific allegations of negligence relative to the provision of equipment, timely assistance, training and allegations directed toward the activities of the librarian, Marie Klingler, a trained emergency medical technician who occasionally provided first aid services when called upon to do so. Since the district court addressed only the applicability of I.C. § 6–904(1) as a basis for the summary judgment, and since there is not yet a factual record developed on the various above-listed allegations, this Court cannot rule upon whether plaintiffs are or are not entitled to recover under those claims, because they likewise involve questions of fact.

### III. Emotional Distress

The district court granted the defendant's motion on the basis of the discretionary function exception, without addressing the appropriateness of the cause of action for negligent infliction of emotional distress. Idaho Code § 1–205 requires this court, when remanding a case for further proceedings, to "pass upon and determine all the questions of law involved in the case presented upon such appeal." *Nielsen & Co. v. Cassia and Twin Falls County Joint Class A School Dist.*, 103 Idaho 317, 647 P.2d 773 (Ct.App.1982). Since the Court is remanding the Czaplickis' case to the district court, it now provides guidance on this issue by holding that the Czaplickis have adequately plead a cause of action under Idaho law for negligent infliction of emotional distress.

▇▇▇ It is beyond dispute that in Idaho no cause of action for negligent infliction of emotional distress will arise where there is no physical injury to the plaintiff. *Hathaway v. Krumery*, 110 Idaho 515, 716 P.2d 1287 (1986); *Hatfield v. Max Rouse & Sons Northwest*, 100 Idaho 840, 606 P.2d 944 (1980). The "physical injury" requirement is designed to provide some guarantee of the genuineness of the claim in the face of the danger that claims of mental harm will be falsified or imagined. *Hatfield*, 100 Idaho at 849, 606 P.2d 944. Physical manifestations of the emotional injury enable a plaintiff to posit a claim for negligent infliction of emotional distress. *Hatfield* at 851, 606 P.2d 944. The Czaplickis' complaint alleges that defendants' actions have proximately caused "severe emotion and result in physical pain and injury to the plaintiff, Rose Czaplicki," and have "caused severe emotion and commensurate physical injury to plaintiff Russell Czaplicki." The Czaplickis describe various emotional injuries that have manifested themselves in physical symptoms such as severe headaches, occasional suicidal thoughts, sleep disorders, reduced libido, fatigue, stomach pains and loss of appetite.

In *Rasmuson v. Walker Bank & Trust Co.*, 102 Idaho 95, 100, 625 P.2d 1098 (1981), this Court stated:

> The plaintiff also appeals the district court's dismissal of her counts seeking recovery for negligent and intentional infliction of emotional distress caused by negligent, bad faith and reckless trust management. This Court's recent opinion in *Hatfield v. Max Rouse & Sons Northwest*, 100 Idaho 840, 606 P.2d 944 (1980), specifies the requirements to successfully bring these torts. Inasmuch as there were no allegations of physical manifestations involved in the case at bar, the tort of negligent infliction of emotional distress does not lie.

Construing the facts in the existing record most liberally in the Czaplickis' favor, as is required of this Court in reviewing the district court's summary judgment decision (*see* n. 1, *supra*, this opinion), reveals at a minimum that a genuine issue of material fact exists with respect to the Czaplickis' claims for the negligent infliction of emotional distress.

### IV. Venue

▇▇▇ The Czaplickis invite this Court to rule upon the merits of their motion for change of venue. That motion has not yet been passed upon by the trial court because the granting of the motion for summary judgment rendered that issue moot. The matter of whether or not a motion for change of venue should be granted is a matter which is properly first subjected to

the discretion of the trial court: I.R.C.P. 40(e)(1); *Lessman v. Anschustigui,* 37 Idaho 127, 215 P. 460 (1923); *Gibbert v. Washington Water Power Co.,* 19 Idaho 637, 115 P. 924 (1911). Accordingly, that issue is not yet ripe for appellate review.

Costs to appellant. No attorney fees awarded.

BISTLINE and JOHNSON, JJ., concur.

BAKES, C.J., concurs in part and dissents in part.

SHEPARD, Justice, dissenting.

The adjective recitation of facts in the majority opinion leaves little doubt as to the result it will obtain. In my view the sole operative facts are as follows. An otherwise healthy child collapsed while in school. A trained emergency medical technician who was employed as a school librarian was immediately called to the scene and helped attend to the child. Because of the instructions of the principal, there was a delay of approximately eight minutes before an ambulance was called. The child was pronounced dead at the hospital. An autopsy was performed, but no cause of death was determined except a probable obstruction in the air passage. Although expert witnesses testified by way of deposition that earlier arrival at the hospital might have permitted the saving of the life of the child, they did not know that would have been done, nor did they fault the actions of the emergency medical technician and the ambulance personnel.

In my view the only issue presented is whether the trial court's issuance of summary judgment was correct. At that juncture any conflict in the facts, or inferences arising therefrom, must be construed most favorably toward plaintiffs. Applying that standard, it is my view that the only question presented herein is whether there existed a duty on the part of the school principal to have ordered the calling of an ambulance in a more expeditious fashion. I know of no statutory or common law "duty" imposed in such a situation. Hence, in my view there has been no breach of such a "duty" under the instant circumstances. While the death of the child is indeed tragic, there is no showing in the record before the trial court or this Court as to the cause, or how if at all it could have been prevented. In the absence of a "duty" there can be no "tort" and no imposition of liability under the Tort Claims Act.

Even assuming that the action or inaction by the personnel involved in the instant case somehow constituted tortious conduct, nevertheless I.C. § 6–904(1) provides: "A governmental entity and its employees while acting within the course and scope of their employment without malice or criminal intent shall not be liable for any claim which: 1) arises out of any act or omission of an employee of the governmental entity *exercising ordinary care,* ..." (Emphasis added.) Here the facts demonstrate no lack of ordinary care on the part of the school principal in delaying a call for an ambulance while the child was under the care of the emergency medical technician. In my view the facts, even when viewed from the standpoint most favorable to the plaintiffs, demonstrate no triable question of lack of ordinary care.

I am aware of the decision by this Court in *Sterling v. Bloom,* 111 Idaho 211, 723 P.2d 755 (1986) which stated that the "discretionary function" contained in the Tort Claims Act "does not include functions which involved *any* element of choice, judgment or ability to make responsible decisions; otherwise every function would fall within the exception." I did not participate in the *Sterling* decision and herein indicate my disagreement with that language. To argue, as does *Sterling,* that the exercise of discretion does not involve any element of choice, judgment or decision making, is a contradiction of terms.

As to the other allegations of negligence asserted in plaintiffs' complaint, such as failure to have medical supplies and equipment available, failure to provide adequate medical emergency training to school personnel, failure to establish adequate policies, practices or procedures regarding the training of personnel in emergency first

aid, inadequate training of the principal in procedures for providing and securing medical assistance, and negligently training the principal in emergency first aid, are all policy decisions of the school board which are tied directly or indirectly to the budgetary constraints under which school districts operate under state law. Hence, in my view all those issues fall within the constraints of the Tort Claims Act and demonstrate the immunity of the school district and its employees.

I further dissent from that portion of the majority opinion which deals with plaintiffs' claim for negligent infliction of emotional distress. I consider it inappropriate for the majority of this Court to undertake such a major change in the law of this jurisdiction based on the scant record before it, and the absence of any decision by the trial court in this regard. *See Gill v. Brown*, 107 Idaho 1137, 695 P.2d 1276 (Ct. App.1985); *Payton v. Abbott Labs*, 386 Mass. 540, 437 N.E.2d 171 (1982); *Sears Roebuck & Co. v. Young*, 384 So.2d 69 (Miss.1980); Prosser & Keeton on Torts ¶ 54, p. 364 (5th ed.).

BAKES, Chief Justice, concurring in part and dissenting in part:

Until this Court's decision in *Sterling v. Bloom*, 111 Idaho 211, 723 P.2d 755 (1986), is overruled either by the legislature or by this Court, the majority may well be correct in concluding that there was a triable issue of fact over whether or not the principal was negligent in calling off the ambulance, and also whether that act of alleged negligence was an operational rather than a policy decision, and thus not immune under the Tort Claims Act.

However, the other alleged acts of negligence described in the plaintiffs' complaint, *i.e.*, failure to have medical supplies and equipment available, failure to provide adequate medical emergency training to school personnel, failure to establish adequate policies, practices or procedures regarding the training of personnel in emergency first aid, inadequate training of the principal in procedures for providing and securing medical assistance, and negligently train-

ing the principal in emergency medical first aid, are all policy decisions of the school board, which for the most part are tied directly or indirectly to the budgetary constraints under which school districts operate. Those are policy decisions resulting from statutory limitations placed upon school districts to raise funds to carry out their educational function. Accordingly, in my view, on those other issues the school district is immune from liability under the Tort Claims Act.

Regarding Part III of the majority opinion, dealing with the issue of emotional distress, our prior cases have required that any claim for damages for negligent infliction of emotional distress be accompanied with objective physical manifestations before any such claim is cognizable. Subjective claims of pain, injury or suffering are not sufficient. There must be objective physical manifestations. Complaints such as those raised by the plaintiffs in this case, such as loss of appetite, stomach pains, fatigue, reduced libido, sleep disorders, suicidal thoughts and headaches, are not the kinds of objective physical manifestations which our cases, and the cases from other jurisdictions around the country, have allowed recovery for under a claim of negligent infliction of emotional distress. *Payton v. Abbott Labs*, 386 Mass. 540, 437 N.E.2d 171, 181 (1982) ("In order to recover for negligent infliction of emotional distress, the plaintiff must allege and prove physical harm [which] must be manifested by objective symptomology and substantiated by expert medical testimony"); *Sears, Roebuck & Co. v. Young*, 384 So.2d 69, 71 (Miss.1980) (no recovery allowed for mental distress without a showing of "objectively observable physical consequences"); W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser & Keeton on The Law of Torts ¶ 54 at p. 364 (5th ed. 1984) ("[T]he mental distress [must] be certified by some physical injury, illness or other objective physical manifestation."); *Gill v. Brown*, 107 Idaho 1137, 1138, 695 P.2d 1276, 1277 (Ct. App.1985) ("In order for the tort of negligent infliction of emotional distress to lie, the actions of the defendant must have caused some physical injury to the plaintiff

which accompanies the emotional distress.").

Accordingly, I also dissent as to Part III of the majority opinion.