137 P.3d 397

**Justin James REES, individually and as parent and guardian of Tegan Rees, deceased, Plaintiff–Appellant,**

v.

**STATE of Idaho, DEPARTMENT OF HEALTH AND WELFARE, Nicole Ott, Defendants–Respondents,**

and

**Chris Griffeth, Melissa Rees, Bonneville County Sheriff's Department and Greg Black, Defendants.**

No. 31632.

Supreme Court of Idaho, Boise, March 2006 Term.

April 24, 2006.

Rehearing Denied June 29, 2006.

Curtis & Browning, Idaho Falls, for appellant. Allen H. Browning argued.

Hon. Lawrence G. Wasden, Attorney General, Boise; Beard, St. Clair, Gaffney, McNamara & Calder, PA, Idaho Falls, for respondents. Michael Dean Gaffney argued.

BURDICK, Justice.

This case involves an issue of first impression for this Court: whether the Idaho Department of Health and Welfare (the Department) and its employees can be liable for negligently investigating a reported case of child abuse. Tegan Rees (Tegan), a two-year old child, was beaten to death by his mother's boyfriend. His father, Justin Rees (Rees) had previously reported suspected child abuse to the Department. After conducting an investigation, licensed social worker Nichole Ott Aldinger (Ott) returned Tegan to his mother's custody. Less than two months later, Tegan died. Rees then brought a wrongful death action against the Department and Ott. The district court granted summary judgment for the Department and Ott. Rees appeals from that judgment. We reverse and remand.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On September 16, 2001, Rees went to the apartment his ex-wife, Melissa Rees (Melissa), shared with her boyfriend, Chris Griffeth (Griffeth), to pick up his son, Tegan. Griffeth answered the door and Rees noticed Tegan had bruises and other injuries on his head and face. Rees left with Tegan. When they arrived at Rees's mother's home, Rees telephoned the Bonneville County Sheriff's Department (BCSD) to report suspected child abuse.

Sheriff's Deputy Greg Black (Black) responded to the call. He interviewed Tegan and Rees. Black then went to Melissa's apartment to discuss the child abuse report with her and Griffeth. Melissa told Black that Tegan had been injured while playing in the apartment complex, and she also accused Rees and his family of abusing Tegan. Black then contacted the deputy prosecuting attorney for Bonneville County and notified the Department. Black told Melissa that because of Tegan's suspicious injuries, the Department would find Tegan temporary foster care while the Department conducted an investigation. Melissa suggested Tegan instead stay with his day care provider, Gail Hampton (Hampton). When Black explained the situation to Rees, he agreed to allow Tegan to stay with Hampton. Black and Christie Rees, Rees' mother and Tegan's grandmother, took Tegan to Hampton's home.

The following day, Ott received a referral for an immediate risk assessment regarding Tegan. She telephoned Melissa, who informed Ott that she was not home when Tegan was injured but her neighbors had told police that a neighbor boy had tripped Tegan causing him to fall and hit his head on the sidewalk. Ott and another licensed social worker, Danielle Hawkins, then visited Tegan at Hampton's home. Ott attempted to interview Tegan and spoke with Hampton. Hampton told Ott there were no bruises on Tegan the previous day when she was watching him, but he had two black eyes and bruises on his forehead when he was brought to her home by Black and Christie Rees. She also told Ott that Rees, Melissa and Griffeth had all been good to Tegan in her presence, that Melissa had also sought appropriate medical care for Tegan, and that Tegan always came to her home clean and well-fed.

Ott and Hawkins then went to Melissa's home and interviewed both Melissa and Griffeth. They both stated neighbors had been watching Tegan prior to Rees picking him up and Tegan did not have any bruising on his face or head when he left their care. Ott informed Melissa that she wanted Tegan to see a doctor, and Melissa made an appointment for Tegan later that day.

Ott also spoke with Melissa and Griffeth's neighbors. Their next door neighbor told Ott she had seen Tegan the night before the report was made and he did not have any bruises on his head. She also saw Tegan the morning Rees picked him up and Tegan did not have any bruises at that time. Ott also spoke with another neighbor, Beth.[1] Beth and her son, Tyler, had been caring for Tegan the day of the incident. Beth told Ott that Tyler, Tegan and other children were playing outside. Tyler then brought Tegan to Melissa's apartment, where Beth was, and told her another boy had tripped Tegan. She stated that a bruise was beginning to show on Tegan's face. She also told Ott that neither Melissa nor Griffeth were home at the time Tegan was injured.

Ott, Melissa and Tegan then met with Wade Christensen (Christensen), a physician's assistant at Tegan's pediatrician's office. Christensen examined Tegan's ears as part of a well-baby check-up for Tegan's frequent ear infections. He also questioned Melissa about Tegan's injuries. Melissa told Christensen her neighbors saw Tegan fall and hit his head. Although Ott was present during the examination at no time during this visit did she speak.

'Based on her investigation Ott concluded Tegan was not at risk and returned him to Melissa's care. The next day, she informed Rees that the investigation was closed. She told him that after speaking with witnesses and with Dr. Baker she had found this was an invalid case of reported abuse.[2]

Tragically, less than two months later, on November 6, 2001, Tegan died as a result of abuse by Griffeth.[3] Rees then brought suit against Melissa, Griffeth, Black, BCSD, Ott and the Department. All the defendants but Ott and the Department were dismissed from the suit. The Department and Ott then moved for summary judgment. The district court granted this motion; Rees appeals from that judgment.

1. Nothing in the record indicates Beth's last name.

2. Ott mistakenly believed that Christensen was Dr. Baker, Tegan's pediatrician.

## II. ISSUES ON APPEAL

1. Did the district court err in granting summary judgment to the Department and Ott?

2. Is either party entitled to attorney's fees on appeal?

## III. STANDARD OF REVIEW

When reviewing a motion for summary judgment, this Court uses the same standard employed by the trial court when deciding such a motion. *Kolln v. Saint Luke's Regl. Med. Ctr.,* 130 Idaho 323, 327, 940 P.2d 1142, 1146 (1997). "[I]f the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law" summary judgment is proper. I.R.C.P. 56(c). The burden is on the moving party to prove an absence of genuine issues of material fact. *See, e.g., Evans v. Griswold,* 129 Idaho 902, 905, 935 P.2d 165, 168 (1997). In addition, this Court views the facts and inferences in the record in favor of the non-moving party. *Id.*

Whether a duty exists is a question of law over which this Court exercises free review. *Turpen v. Granieri,* 133 Idaho 244, 247, 985 P.2d 669, 672 (1999).

## IV. ANALYSIS

In addition to the "strong line" of authority setting out the standards under which this Court reviews a motion for summary judgment, *Harris v. State Dept. of Health & Welfare,* 123 Idaho 295, 298, 847 P.2d 1156, 1159 (1992), when reviewing a motion for summary judgment against a governmental entity and its employees under the Idaho Tort Claims Act (ITCA), this Court must engage in a three step analysis. *Coonse ex rel. Coonse v. Boise Sch. Dist.,* 132 Idaho 803, 805, 979 P.2d 1161, 1163 (1999); *Harris,* 123 Idaho at 298 n. 1, 847 P.2d at 1159 n. 1; *Olguin v. City of Burley,* 119

3. Griffeth was tried and convicted of Tegan's murder.

Idaho 721, 723, 810 P.2d 255, 257 (1991); *Czaplicki v. Gooding Joint Sch. Dist.*, 116 Idaho 326, 330, 775 P.2d 640, 644 (1989). First, we must determine whether "tort recovery is allowed under the laws of Idaho." *Harris*, 123 Idaho at 298 n. 1, 847 P.2d at 1159 n. 1. This is essentially a determination of whether there is such a tort under Idaho Law. *Czaplicki*, 116 Idaho at 330, 775 P.2d at 644. Second, this Court determines if "an exception to liability under the ITCA shields the alleged misconduct from liability." *Coonse*, 132 Idaho at 803, 979 P.2d at 1163. Finally, "if no exception applies, [we examine] whether the merits of the claim as presented for consideration on the motion for summary judgment entitle the moving party to dismissal." *Id.*

Therefore, we will first examine whether Ott and the Department were entitled to summary judgment under this three-part analysis, turning then to the issue of attorney's fees.

**A. Summary Judgment**

1. *Is tort recovery allowed under the laws of Idaho?*

 Rees brought a wrongful death action, premised on negligence, against both Ott and the Department. Under Idaho law, a cause of action for negligence includes proof of "a duty, recognized by law, requiring the defendant[s] to conform to a certain standard of conduct." *Coghlan v. Beta Theta Pi Fraternity*, 133 Idaho 388, 399, 987 P.2d 300, 311 (1999). The parties correctly agree the Department and Ott owed no general duty to Tegan; therefore, the issue for this Court becomes whether Idaho law recognizes a special duty of care in this instance.

Rees argues the Idaho Child Protection Act (ICPA), I.C. § 16–1601 *et seq.*, creates in the Department an affirmative duty to competently investigate reports of child abuse. In support, he asks this Court to adopt the reasoning of other jurisdictions that have examined their child protection statutes and regulations and determined a special duty arises during child abuse investigations. Conversely, Ott and the Department stand on two prior Idaho Court of Appeals cases refusing to recognize the tort of negligent investigation and point this Court to other jurisdictions that have refused to recognize a duty to competently investigate reported child abuse.[4]

 Ordinarily, "there is no affirmative duty to act to assist or protect another absent unusual circumstances, which justifies imposing such an affirmative responsibility. An affirmative duty to aid or protect arises only when a special relationship exists between the parties." *Id.* at 399, 987 P.2d at 311; *see also Turpen v. Granieri*, 133 Idaho 244, 248, 985 P.2d 669, 673 (1999) (citing Restatement (Second) Torts § 315 (1966) for the proposition that such an affirmative duty can arise under instances where "a special relationship exists between the actor and the other which gives the other a right to protection"). Determining when a special relationship exists sufficient to impose an affirmative duty requires an evaluation of "the sum total of those considerations of policy which lead the law to say that a particular plaintiff is entitled to protection." *Coghlan*, 133 Idaho at 399, 987 P.2d at 311 (quoting W. Prosser, Law of Torts 333 (3d ed.1964)).

Most of the courts in other jurisdictions that have considered whether the state agency charged with investigating child

---

4. Ott and the Department also argue that they had no special relationship with Tegan because he was not in their custody and, therefore, had no duty to warn or protect him. Aside from the obvious fruitlessness of warning an abused two-year old about the abuse, Rees has not argued on appeal that Ott and IDHW had a duty to warn Tegan, and the case on which Ott and the Department rely, *Caldwell v. Idaho Youth Ranch, Inc.*, 132 Idaho 120, 968 P.2d 215 (1998), is inapplicable to the situation presented here. The duty discussed in *Caldwell* is a duty to protect or warn third parties of a danger created by a

person in custody. This Court has expressly pointed out that "the key to this duty is not the supervising individual's *direct* relationship with the endangered person or persons, but rather is *the relationship to the supervised individual.*" *Sterling v. Bloom*, 111 Idaho 211, 225, 723 P.2d 755, 769 (1986) (emphasis in original) (superseded on other grounds, I.C. § 6–904A). Here, Tegan was the supervised individual, not the third party to whom the Department would owe a duty to warn, and Tegan's behavior was not causing any danger.

abuse reports has a duty to competently investigate have determined such a duty exists. *Horridge v. St. Mary's County Dept. of Soc. Servs.*, 382 Md. 170, 854 A.2d 1232, 1243 (2004).[5] Generally, courts that have considered this issue have used the same framework; they look to their statutes to determine whether they require a particular action by an agency to benefit a particular class of people rather than a duty running to the general public. *See Turner v. Dist. of Columbia*, 532 A.2d 662, 672 (D.C.App.1987); *see also Radke v. County of Freeborn*, 694 N.W.2d 788, 793 (Minn.2005) (noting the "public duty rule" requires a governmental unit "owe the plaintiff a duty different from that owed to the general public in order for the governmental unit to be found liable"); *Jensen v. Anderson County Dept. of Soc. Servs.*, 304 S.C. 195, 403 S.E.2d 615, 617 (1991) ("An exception to this general rule of non-liability [under the public duty rule] exists when a duty is owed to individuals rather than the public only."). This approach accords with Idaho's law on determining whether a special relationship or duty exists. *See Coghlan*, 133 Idaho at 399, 987 P.2d at 311; *Turpen*, 133 Idaho at 248, 985 P.2d at 673.

While various jurisdictions have employed different tests for determining whether a duty exists to competently investigate reported child abuse, we find the test employed by the Supreme Court of Minnesota is the most instructive in this case. In *Radke* the court applied a fact-intensive test when determining the agency charged with investigating reported child abuse owed a duty to a child who was beaten to death by his mother's boyfriend. 694 N.W.2d at 794, 796–97. There, the court noted under Minnesota law a statute alone could not create a special duty; rather there must be additional indicia the governmental unit "has undertaken the responsibility of protecting a particular class of persons[ ] from the risks associated with a particular harm." *Id.* at 793. It then considered four non-exhaustive

factors to determine if the government assumed responsibility for protecting reportedly abused and neglected children:

(1) Whether the governmental unit had actual knowledge of the dangerous condition;

(2) Whether there was reasonable reliance by persons on the governmental unit's representations and conduct (such reliance must be based on specific actions or representations which cause the persons to forego other alternatives of protecting themselves);

(3) Whether an ordinance or statute set forth mandatory acts clearly for the protection of a particular class of persons rather than the public as a whole; and

(4) Whether the governmental unit used due care to avoid increasing the risk of harm.

*Id.* at 794. Importantly, these four factors need not all be met for the Court to determine that a duty exists, *id.* at 788, and they do not create a bright-line test, *id.* at 794.

The *Radke* court began its analysis under this four-factor test by first looking to the third factor—determining if Minnesota's statutes set forth mandatory acts clearly for the protection of a particular class of persons rather than the public as a whole. *Id.* at 796–96. The statutes provided that when a child abuse or neglect report was received, "'the local welfare agency shall immediately conduct an assessment . . . and offer protective social services for purposes of preventing further abuses, safeguarding and enhancing the welfare of the abused or neglected minor, and preserving family life whenever possible.'" *Id.* at 796 (quoting Minn.Stat. § 626.556, subd. 10(a)) (emphasis removed). The court concluded:

These mandatory acts prescribed by the statute are for the protection of a particular class of persons—children who are identified as abused or neglected. In fact, the express public policy set forth in the statute is "to protect children whose health

---

**5.** Additionally, the federal courts have acknowledged that welfare agencies or social workers can be liable under 42 U.S.C. § 1983 for failure to carry out statutorily imposed duties. *Coleman v. Cooper*, 89 N.C.App. 188, 366 S.E.2d 2, 7

(1988) (citing *Doe v. New York City Dept. of Soc. Servs.*, 649 F.2d 134 (2d Cir.1981); *Estate of Bailey by Oare v. County of York*, 768 F.2d 503 (3d Cir.1985); *Jensen v. Conrad*, 747 F.2d 185 (4th Cir.1984)).

or welfare may be jeopardized through physical abuse, neglect, or sexual abuse."

The statute further emphasizes that

it is the policy of this state to require the reporting of neglect, physical or sexual abuse of children in the home, school, and community settings; to provide for the voluntary reporting of abuse or neglect of children; to require the assessment and investigation of the reports; and to provide protective and counseling services in appropriate cases.

Based on these declared public policy goals, we conclude that the acts mandated in CARA are not for the protection of the public or even children in general, but are mandated for the protection of a particular class of persons—children who are identified in suspected abuse or neglect reports received by the county. . . . [T]he children protected by CARA are "uniquely vulnerable persons." These children have been identified by suspected child abuse or neglect reports. They are especially vulnerable because they are alleged to have suffered abuse or neglect in the privacy of their homes, often at the hands of a parent or other family member, and cannot protect themselves.

*Id.* at 797 (internal citations omitted).

Following the same analytical framework, we look first to the statutes and rules governing the Department and Ott and note our legislature has explicitly set out the policy behind the ICPA:

The policy of the state of Idaho is hereby declared to be the establishment of a legal framework conducive to the judicial processing including periodic review of child abuse, abandonment and neglect cases, and the protection of any child whose life, health or welfare is endangered. *At all times the health and safety of the child shall be the primary concern.* Each child coming within the purview of this chapter shall receive, preferably in his own home, the care, guidance and control that will promote his welfare and the best interest of the state of Idaho, and if he is removed from the control of one (1) or more of his parents, guardian or other custodian, the state shall secure adequate care for him; provided, however, that the state of Idaho shall, to the fullest extent possible, seek to preserve, protect, enhance and reunite the family relationship. Nothing in this chapter shall be construed to allow discrimination on the basis of disability. This chapter seeks to coordinate efforts by state and local public agencies, in cooperation with private agencies and organizations, citizens' groups, and concerned individuals, to:

(1) Preserve the privacy and unity of the family whenever possible;

(2) Take such actions as may be necessary and feasible to prevent the abuse, neglect, abandonment or homelessness of children;

(3) Take such actions as may be necessary to provide the child with permanency including concurrent planning;

(4) Clarify for the purposes of this act the rights and responsibilities of parents with joint legal or joint physical custody of children at risk.

I.C. § 16–1601 (2003) (emphasis added). This Court has recognized the dual aim of the ICPA, stating this language "indicates that the legislature expressly intended [the ICPA] to protect children from parents, guardians or other custodians who posed a health and safety threat to their children, and to remove such children from unsafe family environments." *In re Doe,* 134 Idaho 760, 766, 9 P.3d 1226, 1232 (2000) (internal citations omitted). "At the same time," this Court noted, "the legislature [also] intended the ICPA to reunite the children with their families once the hazards could be removed." *Id.* at 766, 9 P.3d at 1232.[6]

The ICPA also grants the Department "primary responsibility to implement the purposes of this chapter." I.C. § 16–1623 (2003) (now codified at I.C. § 16–1629). "To this end, [the Department] is empowered and shall have the duty to do all things reason-

---

**6.** The language of the statute has been amended since this decision, but those amendments do not affect the analysis in the present case.

ably necessary to carry out the purpose of this chapter. . . ." *Id.* Additionally, the ICPA authorizes the Department to act upon receiving a report of child abuse, neglect or abandonment by causing an investigation "to be made in accordance with this chapter as is appropriate." I.C. § 16–1625 (2003) (now codified at I.C. § 16–1631). In turn, the Idaho Administrative Procedure Act (IDAPA) sets out mandatory acts for the protection of abused, neglected, or abandoned children. It requires all suspected abuse be assigned for investigation, IDAPA 16.06.01.553, mandates statewide standards for prioritizing suspected abuse, neglect or abandonment, IDAPA 16.06.01.554, sets time-limits for investigation and requires supervisory review of those investigations in certain cases, IDAPA 16.06.01.555, and provides a mandatory, standardized format for conducting risk assessments, IDAPA 16.06.01.559.

Our legislature has made clear that health and safety of reportedly abused children is the focus of the ICPA. I.C. § 16–1601. This is not a general duty; rather it is a duty running to a narrow class of persons—abused and neglected children—who are particularly vulnerable because they allegedly suffer abuse in the privacy of their homes and cannot protect themselves. Additionally, the ICPA and IDAPA make clear this state's policy to protect the life, health and welfare of children endangered by abuse or neglect by taking mandatory actions to prevent further abuse and neglect. Our legislature has created a duty owed to a narrow, easily identified class of persons to be protected from a particular harm.

The relationship created by this statute between the Department and abused children goes far beyond that of police or other investigatory agencies and crime victims. The ICPA creates a class of mandatory reporters, I.C. § 16–1605 (2005) (formerly codified at I.C. § 16–1619), and grants immunity to any person who makes a good faith report of child abuse or neglect, I.C. § 16–1606 (formerly codified at I.C. § 16–1620).[7] The ICPA also mandates the creation of multidisciplinary teams consisting of at least law enforcement personnel, Department child protection risk assessment staff, and a representative of the county prosecuting attorney's office to investigate reports of child abuse. I.C. § 16–1617 (formerly codified at I.C. § 16–1609A). Their creation also shows the legislature's goal of providing professional investigation of suspected child abuse and neglect and also shows the intent that these investigations be carried out by the best groups available. We conclude from this that the ICPA creates a special relationship between allegedly abused children and the Department. Therefore, the third factor from *Radke*—"whether an ordinance or statute set forth mandatory acts clearly for the protection of a particular class of persons rather than the public as a whole"—has been met, and in this instance weighs heavily in favor of finding a duty under Idaho law to competently investigate reported child abuse.

We will turn now to examining the other three factors set out by the *Radke* court. Examining the first factor—whether the Department had actual knowledge of the dangerous condition—we note Rees reported suspected abuse, and there is no question that the Department knew about the danger to Tegan in Melissa and Griffeth's home. We conclude the Department had actual knowledge of the dangerous condition. This adds weight to the conclusion that the Department and Tegan had a special relationship creating a duty to competently investigate. Turning now to the second factor—whether there was reasonable reliance on the investigator's representations and conduct that caused Rees to forgo other alternatives of protecting Tegan—we find that Rees reasonably relied on both Black and the Department's statements and conduct. First, it is undisputed Black told Rees he would make sure Tegan was protected within what the law allows. Additionally, Tegan was removed from both Rees and Melissa so an investigation into the reported abuse could be conducted. It was reasonable for Rees to

---

7. This grant of immunity also demonstrates that our legislature did not intend for the IDHW and its case workers to be immune from liability. Clearly, the legislature could have included a provision granting immunity to the Department and its caseworkers, but did not. This is especially persuasive in light of the extensive changes to the ICPA adopted by our legislature in 2005.

rely on both Black's statements and the Department's conduct in removing Tegan from his care. Such reliance also weighs in favor of determining that a duty to competently investigate the suspected abuse existed in this instance.

Finally, we note the fourth factor requires us to consider whether the Department used due care to avoid future harm to Tegan. However, this analysis is substantially similar to the analysis required to determine if the Department is immune under the ITCA. While the question of due care will be discussed in greater detail below, we note here that there is a genuine issue of material fact as to whether Ott and the Department exercised due care in their investigation. Therefore, we conclude that under these circumstances the Department and Ott owed to Tegan a duty to competently investigate the reported child abuse because of the special relationship created once the report of suspected abuse was received.

2. *Is there an exception to liability under the ITCA?*

■■■■ Rees next argues that because the ICPA creates a duty to competently investigate claims of child abuse, the ITCA does not shield the Department and Ott from liability.[8] The Department and Ott, on the other hand, argue that as a matter of law Ott exercised ordinary care during her investigation and that since Tegan's injuries arose out of a battery, neither the Department nor Ott can be liable under the ITCA.

Idaho Code § 6–904 provides, in pertinent part:

A governmental entity and its employees while acting within the course and scope of their employment and without malice or criminal intent shall not be liable for any claim which:

1. Arises out of any act or omission of an employee of the governmental entity exercising ordinary care, in reliance upon or the execution or performance of a statutory or regulatory function, whether or not the statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a governmental entity or employee thereof, whether or not the discretion be abused.

. . .

3. Arises out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights.

I.C. § 6–904(1), (3).

■■■■ The purpose of the ITCA is to provide "much needed relief to those suffering injury from the negligence of government employees." *Sterling v. Bloom,* 111 Idaho 211, 214, 723 P.2d 755, 758 (1986) (quoting *United States v. Muniz,* 374 U.S. 150, 165, 83 S.Ct. 1850, 10 L.Ed.2d 805 (1963)) (superseded on other grounds by statute, I.C. § 6–904A, as noted by *Harris v. State,* 123 Idaho 295, 301, 847 P.2d 1156, 1162 (1992)).[9] The ITCA is to be construed liberally, consistent with its purpose, and with a view to "attaining substantial justice." *Id.* at 214–15, 723 P.2d at 758–59. Therefore, under the ITCA liability is the rule and immunity is the exception. *Id.*

Turning first to the third subsection of I.C. § 6–904, the Department and Ott argue that since Tegan's injuries and death arose from the battery by Griffeth, this subsection provides them immunity from suit. However, as this Court has pointed out, there "is a distinction between the conduct which forms the basis of a cause of action in negligence and one for assault and battery." *Doe v. Durts-*

---

8. The district court examined this question after declining to recognize a tort that this Court had not yet acknowledged, because it found that Idaho does recognize the tort of malpractice. Rees did not explicitly appeal the district court's determination that IDHW and Ott are immune from suit for malpractice, but our holding here applies equally to that claim.

9. *Sterling* dealt with a negligence claim against a probation officer whose probationer violated the terms of his probation and injured Sterling. The Court held that I.C. § 6–904 was a broad statute. Subsequently, the legislature adopted I.C. § 6–904A, which provided immunity in situations such as *Sterling* and *Harris.*

*chi,* 110 Idaho 466, 471, 716 P.2d 1238, 1243 (1986).

In *Durtschi,* school children were injured after the school district retained a teacher known to have engaged in sexual abuse of students. This Court refused to apply the exception found in I.C. § 6–904(3) because the "very risk which constituted the district's negligence was the probability that such actions might occur." *Id.* at 472, 716 P.2d at 1244. To afford immunity to "a negligent defendant because the intervening force, the very anticipation of which made his conduct negligent, has brought about the expected harm" would "fly in the face of basic tort principles." *Id.* "If the likelihood that a third person may act in a particular manner is the hazard … which makes the actor negligent, such an act whether innocent, negligent, intentionally tortuous, or criminal does not prevent the actor from being liable for harm caused thereby." *Id.*

Likewise, here it is the anticipation that Tegan could be abused again which would make a failure to competently investigate negligent. The battery in this instance was by Griffeth, not the Department. It is the very likelihood of further abuse by Griffeth which makes conducting an incompetent investigation into the reported abuse of Tegan negligent. *See id.* Therefore, in accordance with our decision in *Durtschi* we hold that I.C. § 6–904(3) does not provide immunity to the Department or Ott.

■■■■ Turning next to the "regulatory function" clause of the first subsection of I.C. § 6–904, the Department and Ott argue they are immune from liability because Ott exercised ordinary care in her investigation. They contend this Court should determine the undisputed evidence in this case leads to only one reasonable conclusion: Ott exercised ordinary care pursuant to her statutory and regulatory functions.

■■■■ The " 'regulatory function' and 'discretionary function' clauses of I.C. § 6–904(1) represented two different types of actions that might be immune under the ITCA but the same test applied to each." *Leliefeld v. Johnson,* 104 Idaho 357, 363, 659 P.2d 111, 117 (1983); *see also Sterling,* 111 Idaho at 229–30, 723 P.2d at 773–74. In *Jones v. City of St. Maries,* Justice Huntley noted that the first clause of I.C. § 6–904(1) affords governmental employees immunity if they act with ordinary care and in accordance with policy decisions. 111 Idaho 733, 745, 727 P.2d 1161, 1173 (1986) (Huntley, J., concurring). However, if a governmental employee fails to exercise ordinary care while carrying out the government's policy, then this exception would not afford immunity. *Sterling,* 111 Idaho at 227, 723 P.2d at 771. "Indeed the fact that the first clause extends immunity to non-negligent conduct in the execution of policy carries with it the converse implication that there is no immunity where the government official was negligent in failing to execute that policy." *Id.* at 231, 723 P.2d at 775 (emphasis removed).

■■■■ Therefore, it is necessary to examine the facts of this case to determine whether Ott acted with ordinary care. Under Idaho law whether a government employee exercised ordinary care is normally a factual question best left to the jury. *Czaplicki,* 116 Idaho at 331, 775 P.2d at 645. However, this case comes to the Court on from a grant of summary judgment, so we must view all of the facts and inferences in favor of Rees, the non-moving party. *See, e.g., Evans,* 129 Idaho at 905, 935 P.2d at 168. If reasonable people could reach different conclusions based on the evidence, a motion for summary judgment must be denied. *Farm Credit Bank of Spokane v. Stevenson,* 125 Idaho 270, 272, 869 P.2d 1365, 1367 (1994).

The district court concluded that the Department and Ott were immune from liability under the ITCA because Rees failed to introduce evidence creating a genuine issue of material fact as to whether Ott exercised ordinary care. On appeal, Rees contends Ott failed to exercise ordinary care because she did not interview him, his family, or Black, because she ignored Christensen's statement that Tegan's injuries did not appear to be consistent with a fall, however she remained silent during his examination of Tegan, and because she ascribed a "blatantly false expert opinion to Wade Christensen which formed the basis for the closing of the case[.]"

We turn first to Ott's silence during Tegan's medical examination and her subsequent summary of that exam in her risk assessment. Here, Rees has shown a genuine issue of material fact as to Ott and the Department's negligence. The affidavit of Roseanne Hardin, introduced by Rees in opposition to the Department and Ott's motion for summary judgment, concludes Tegan was prematurely returned to his home and Ott's investigation fell below the applicable standard of care for social workers. Hardin points out that Ott not only failed to question Christensen, whom Ott incorrectly identified as Dr. Baker, Ott also failed to adequately question other collateral witnesses to determine whether Tegan's injuries were consistent with a trip and fall incident. Hardin also stresses that *Dr. Baker* never informed Ott that Tegan's injuries were not the result of abuse, although Ott claims he so informed her, and that the health care practitioner who did examine Tegan, Christensen, also never informed Ott that Tegan's injuries were not consistent with abuse. Relying on such "inaccurate documentation" and incomplete questioning, Hardin concludes, contributed to Tegan being prematurely returned to Melissa's home. Such evidence creates a genuine issue of material fact as to whether Ott and the Department negligently investigated the suspected abuse.

Additionally, Ott's risk assessment notes Melissa related her version of the events surrounding Tegan's injuries to Dr. Baker and then states: "Dr. Baker did not see any indication of this being a non-accidental injury and felt the child was fine to be released to Melissa." Ignoring the misidentification of the health care practitioner, there is no indication in the record that Christensen told Ott that Tegan's injury was not suspicious or not consistent with a fall. Contrary to Rees's claims, there is nothing in Christensen's deposition testimony from which a reasonable person could infer that he ever relayed any suspicions he may have had regarding Tegan's injury to Ott. Nevertheless, Christensen's silence on this matter does not indicate he believed Tegan was not abused or that he was fine to return to Melissa's care as Ott's risk assessment states. A reasonable person could assume at least two things equally well from Christensen's silence: (1) he believed Tegan was abused, but was reluctant to discuss the matter in front of Tegan's mother, or (2) he believed Tegan was not abused. Therefore, for purposes of a summary judgment motion, Ott's misleading statement in her risk assessment regarding Christensen's conclusion creates a genuine issue of material fact as to whether she competently investigated the suspected abuse.

Moreover, Christensen and Ott both also testified Ott did not speak during Tegan's examination. In her briefs to the Court Ott maintained her silence during Tegan's examination was mandated, but she failed to point to any policy or standard which requires her to not inform or question a health care professional of suspected abuse at some point during a medical examination. Additionally, at oral argument, Ott failed to point to any authority from which this Court could conclude questioning Christensen about the plausibility of Tegan being injured in a trip and fall accident would somehow be improper. While posing arguably leading questions to children or incompetent witnesses may be a legitimate concern for a social worker conducting an investigation into child abuse, we cannot conclude it was a legitimate concern here. Ott sought a medical opinion in this instance specifically to help her substantiate the reported abuse. A reasonable person could conclude Ott failed to competently investigate Tegan's injuries because she failed to seek Christensen's opinion on one basic question: were Tegan's injuries consistent with abuse?

Thus, for the foregoing reasons, we find that Rees has introduced sufficient evidence to create a genuine issue of material fact as to the Department and Ott's negligence, and we need not reach the issue of Ott's decision to not interview Rees, his family or Black. Moreover, this Court cannot conclude that as a matter of law Ott and the Department are immune from liability under I.C. § 6–904(1) because of the questions of fact surrounding whether Ott exercised due care. Additionally, since there are genuine issues of material fact as to whether the Department and Ott competently investigated the suspected child

**22**

abuse in this instance, we must reverse the district court's order granting summary judgment on the merits of the case.

**B. Attorney's Fees**

■ Rees requests attorney's fees pursuant to I.A.R. 41, and Ott and the Department request attorney's fees pursuant to I.C. § 12–121.

■ "I.A.R. 41 does not provide this Court with a basis for awarding attorney fees on appeal. Rather, this rule simply allows us to award fees if those fees are allowed by some other contractual or statutory authority." *Robbins v. County of Blaine,* 134 Idaho 113, 120, 996 P.2d 813, 820 (2000); *see also Shawver v. Huckleberry Estates,* 140 Idaho 354, 365, 93 P.3d 685, 696 (2004). Therefore, since Rees has failed to provide this Court with statutory authority allowing the award of attorney's fees, this Court will not award him attorney's fees.

■ Additionally, Idaho Code § 12–121 permits an award of attorney's fees to the prevailing party. However, because Ott and the Department have not prevailed on this appeal, we do not award them attorney's fees.

**V. CONCLUSION**

In this instance, Ott and the Department had a duty to competently investigate the report of suspected child abuse. Moreover, the ITCA does not provide either the Department or Ott with immunity from suit because there are genuine issues of material facts as to whether Ott competently performed her investigation into Tegan's injuries. Since there are genuine issues of material fact as to whether Ott and the Department breached their duty to competently investigate the suspected abuse of Tegan, the order granting them summary judgment is reversed, and this case is remanded. Costs to Appellant.

Chief Justice SCHROEDER and Justices TROUT, EISMANN and JONES, concur.

