# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 49279-2021

| | |
|---|---|
| GSN CAPITAL, LLC, DBA STICKS + STONES and DAVE ZORTMAN,     ) | |
| ) | Boise, June 2023 Term |
| Plaintiffs-Appellants,     ) | |
| ) | Opinion filed: January 11, 2024 |
| v.     ) | |
| ) | Melanie Gagnepain, Clerk |
| SHOSHONE CITY & RURAL FIRE DISTRICT,     ) | |
| ) | |
| Defendant-Respondent.     ) | |
| ) | |

Appeal from the District Court of the Fifth Judicial District of the State of Idaho, Lincoln County. Ned C. Williamson, District Judge.

The judgment of the district court is <u>affirmed</u>.

Givens Pursley LLP, Boise, for Appellants. Donald Z. Gray argued.

Naylor & Hales, P.C., Boise, for Respondent. Reid K. Peterson argued.

---

ZAHN, Justice.

GSN Capital, LLC, dba Sticks + Stones and Dave Zortman (collectively "GSN") sued the Shoshone City & Rural Fire District (the "District") after GSN's sawmill property was destroyed by a wildfire. GSN asserted a negligence claim against the District, arguing it should have called for additional mutual aid to combat the fire, should have deployed fire units to protect GSN's property, and should have performed a mitigation and salvage operation to save part of GSN's property. The district court dismissed GSN's claim after determining that the District was entitled to discretionary function immunity for the decision to not call for additional mutual aid and that it did not owe GSN a duty in tort when it decided to route fire resources to protect other residential properties and did not conduct a mitigation and salvage operation until after the fire was contained. On appeal, GSN argues these determinations were erroneous. We agree that the District did not owe GSN a duty in tort for any of the challenged decisions and, therefore, affirm the district court's

judgment dismissing GSN's negligence claim. Because the lack of a duty is fatal to GSN's claims, we do not address the parties' arguments concerning discretionary function immunity and immunity under the Idaho Disaster Preparedness Act.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A.  Factual Background

The District is a fire protection district organized under Idaho Code section 31-1402. It has one full-time employee, Chief Casey Kelley, and relies on volunteer firefighters to provide fire protection services. The District has entered "mutual aid agreements" with surrounding fire agencies and the United States Bureau of Land Management ("BLM"), pursuant to which the District may request assistance from those agencies in case of an emergency. A call for mutual aid is a request for assistance, but each agency determines whether to respond and how many units to send depending on their availability.

At around 11:00 p.m. on July 25, 2017, lightning started a wildfire northwest of the City of Shoshone. The District was dispatched to the fire. Chief Kelley responded to the scene and determined the fire was burning on land managed by the BLM. Chief Kelley called the BLM for assistance and the BLM assumed full command of the firefighting operations when it arrived on the scene. The District assisted the firefighting operations until the BLM established a containment line outside of Shoshone. The BLM released the District from firefighting operations during the afternoon of July 26.

Around 7:00 p.m. that evening, Chief Kelley was notified that a high-wind thunderstorm caused the fire to break containment. The BLM requested the District return to aid with firefighting efforts. At 7:26 p.m., Chief Kelley and several District trucks and personnel arrived at the scene of the fire, which was quickly approaching Shoshone. Chief Kelley estimated that approximately twenty to thirty homes were in danger. As he arrived on scene, Chief Kelley called for mutual aid assistance from Gooding Fire, Richfield Fire, Dietrich Fire, Jerome Rural Fire, and Jerome City Fire. Chief Kelley recognized that he could have also requested mutual aid from Twin Falls County, but concluded additional units would not be impactful.

Approximately thirty minutes after Chief Kelley arrived on scene, the District and the BLM entered "unified command," which meant that both agencies coordinated their resources to fight the fire. The District's immediate response consisted of two firefighting units and Chief Kelley's command vehicle. A third District firefighting unit arrived on scene at approximately 7:40 p.m.

2

Chief Kelley directed the District's units to take defensive action to protect property threatened by the fire. Chief Kelley directed one unit to protect several homes and another unit to protect against the fire jumping across a roadway. These units began successfully diverting the fire around the threatened homes. The units were then reassigned to protect a log home where the outbuilding had caught fire. The BLM asked the District's third unit to assist with protecting other homes in the area, and Chief Kelley agreed to let the third unit continue aiding the BLM in its protective operations.

At 7:50 p.m., emergency crews began evacuating residents living in homes and an RV park threatened by the fire. At approximately 8:00 p.m., an emergency crew drove onto the GSN property and asked Mrs. Zortman to evacuate, but she declined. The GSN property is located in Shoshone, east of the area where immediate firefighting operations were taking place. The GSN property contains a sawmill business called Sticks + Stones, which the Zortmans own and operate. The Zortmans were in the process of building a permanent residence on the property and were temporarily living in an RV on the property. In addition to the large sawmill, the Sticks + Stones portion of the property contains significant amounts of highly flammable materials such as sawdust, woodchips, and stacked logs. The GSN property had not been fitted with sprinklers, had not been subject to controlled burns, and did not contain fire lines.

Shortly after 8:00 p.m., the fire jumped across a road into a large vacant area containing dry brush and grass. The fire quickly began expanding within the vacant area, threatening a trailer park to the north, homes to the south, and the GSN property to the east. At this time, Chief Kelley decided that it would be too dangerous to position units in front of the advancing fire given its speed. The fire quickly burned through the vacant area and toward the GSN property.

At approximately 8:18 p.m., the first mutual aid unit arrived at the scene, which was commanded by Gooding Fire Chief Brandon Covey. When Chief Covey arrived, the GSN property was either on fire or imminently threatened. Chief Kelley ordered Chief Covey to defend homes south of the vacant area near the GSN property. When Chief Covey arrived to defend the homes, he noticed the Sticks + Stones sawmill had caught fire. Chief Covey spoke with an individual who indicated that nobody was in the sawmill and everyone from the GSN property was safe. For safety reasons, Chief Covey decided not to move in front of the fire as it quickly spread east. Instead, Chief Covey defended the homes to the south. Chief Kelley concluded at this time that there was

no reasonable strategy for protecting Sticks + Stones from the fire. Chief Kelley instead deployed additional resources to protect homes and mobile homes threatened to the north and south.

At approximately 8:30 p.m., a District fire unit drove into the Sticks + Stones driveway and District volunteers witnessed the sawmill burning fiercely. The District unit moved on to an area south of the GSN property to prevent the fire from spreading there. At this time, a BLM crew indicated over the radio that it was leaving the GSN property near the sawmill because it was too hot and dangerous.

Once the fire reached the GSN property, it rapidly spread. Except for a sales yard and the partially built residence, the GSN property became fully engulfed in fire soon after the BLM crew radioed that it was leaving the area. Sometime after the BLM drove on to the Sticks + Stones property, Chief Kelley drove onto the GSN property to assess the situation and determined not to take any action at that time due to firefighter safety concerns and lack of resources. Firefighting efforts continued around, but not on, the GSN property.

At approximately 10:45 p.m., Chief Kelley felt the fire had been contained to the point where the houses and mobile homes were no longer immediately threatened. Available crews then worked to contain, rather than extinguish, the fire on GSN's property so it would not spread to the surrounding area. At approximately 2:30 a.m., Mr. Zortman returned to the GSN property to assess the damage. Mr. Zortman spoke with a District unit nearby and asked for assistance protecting the unburnt sales yard. Chief Kelley arrived shortly thereafter and spoke with Mr. Zortman. Mr. Zortman indicated to Chief Kelley that "[t]here was stuff left to save, but it wasn't worth the risk of putting it out at that time when nobody's had any sleep because all of [Chief Kelley's] volunteers were out on the fire the night before all night." Chief Kelley then placed District units near the sales yard to protect that portion of the property, and efforts to prevent the further spread of the fire continued throughout the night.

Sometime the next day, Mr. Zortman was interviewed by multiple news media outlets. Mr. Zortman indicated that "[w]e would thank the firefighters, but they weren't here." After hearing about the interview, Chief Kelley returned to the GSN property and spoke with Mr. Zortman. Mr. Zortman indicated that he was not happy with the District's efforts and asked the District to return and fully extinguish the still-burning sawmill. Later that evening, District units returned to the sawmill and spent 5 hours and 192,000 gallons of water extinguishing the remaining fire.

**B. Procedural Background**

GSN sued the District, alleging its negligence allowed Sticks + Stones to catch fire. GSN later clarified that it alleged the District was negligent for failing to call for additional mutual aid, for not engaging in firefighting operations to prevent the fire from reaching GSN's property, and for not undertaking mitigation and salvage efforts. GSN asserted that (1) the District owed a statutory duty to GSN under Idaho Code section 31-1401; (2) the District owed GSN a duty in tort based on a special relationship; and (3) the District assumed a duty to GSN. The District filed an answer and denied GSN's claims.

The District later filed a motion for summary judgment. The District argued that it was entitled to discretionary function immunity for Chief Kelley's decisions on how to fight the fire and how to allocate resources. The District also argued it did not owe a duty under any of GSN's asserted theories. GSN opposed the District's motion.

The district court granted the District's motion in part and denied it in part. The district court determined as a matter of law that the District did not owe GSN a statutory duty under section 31-1401. The district court then concluded that genuine issues of fact precluded summary judgment on whether the District (1) owed a duty to GSN under a special relationship, or (2) assumed a duty to GSN. Both parties filed motions asking the district court to reconsider its order, which the district court denied.

The district court then held a status conference with the parties to discuss procedures for trial. At the district court's suggestion, the parties agreed to bifurcate the trial. The district court ordered that the first phase would be a court trial concerning whether the District owed GSN a duty in tort. If the district court determined that the District owed GSN a duty, the case would proceed to a jury trial on the remaining elements of GSN's negligence claim.

The district court held a three-day court trial on the duty question, at the conclusion of which it determined that the District did not owe GSN a duty. The district court thereafter entered judgment dismissing GSN's complaint. GSN timely appealed.

## II.    ISSUES ON APPEAL

1. Did the district court err by concluding that the District did not owe a duty to GSN?
2. Is either party entitled to attorney fees on appeal?

5

### III. STANDARDS OF REVIEW

"When reviewing an order for summary judgment, the standard of review for this Court is the same standard used by the district court in ruling on the motion." *Neeser v. Inland Empire Paper Co.*, 170 Idaho 692, 696, 516 P.3d 562, 566 (2022) (quoting *Mendenhall v. Aldous*, 146 Idaho 434, 436, 196 P.3d 352, 354 (2008)). "The court must grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." I.R.C.P. 56(a). "The burden of establishing the absence of a genuine issue of material fact rests at all times with the party moving for summary judgment." *Neeser*, 170 Idaho at 696, 516 P.3d at 566 (quoting *Van v. Portneuf Med. Ctr.*, 147 Idaho 552, 556, 212 P.3d 982, 986 (2009)). "If there is no genuine issue of material fact, only a question of law remains, over which this Court exercises free review." *Demoney-Hendrickson v. Larsen*, 171 Idaho 917, 921, 527 P.3d 520, 524 (2023) (citation omitted).

"This Court's review of a trial court's conclusions following a bench trial is limited to determining whether the evidence supports the findings of fact and whether the findings of fact support the conclusions of law." *Burns Concrete, Inc. v. Teton County*, 168 Idaho 442, 451, 483 P.3d 985, 994 (2020) (citing *Caldwell Land & Cattle, LLC v. Johnson Thermal Sys., Inc.*, 165 Idaho 787, 795, 452 P.3d 809, 817 (2019)). The trial court's findings of fact are upheld if they are supported by substantial and competent, although conflicting, evidence. *Caldwell Land & Cattle*, 165 Idaho at 795, 452 P.3d at 817 (citations omitted). This Court "exercises free review over matters of law and is not bound by the legal conclusions of the trial court[.]" *Id.* (quotation marks omitted) (citation omitted).

### IV. ANALYSIS

GSN's negligence claim against the District is subject to the Idaho Tort Claims Act ("ITCA"). The district court decided the issues of statutory duty and discretionary function immunity on summary judgment. This Court has previously held that a three-stage approach applies when determining whether to grant summary judgment and dismiss a tort claim against a governmental entity:

> On a summary judgment motion, a trial judge should first determine whether the plaintiff's allegation generally states a cause of action "for which a private person or entity would be liable for money damages under the laws of the state of Idaho[.]" In other words, is there such a tort under the laws of Idaho? If so, the court must determine whether, as a matter of law, an exception to liability found in the Tort

Claims Act or elsewhere shields the alleged misconduct from liability. If no exception applies, the trial court must reach the merits of the claim.

*Walker v. Shoshone County*, 112 Idaho 991, 995, 739 P.2d 290, 294 (1987) (citations omitted). In *Walker*, this Court cited three authorities in support of its three-stage approach to analyzing claims arising under the ITCA: Idaho Code section 6-903(a); our decision in *Sterling v. Bloom*, 111 Idaho 211, 723 P.2d 755 (1986), *overruled on other grounds by Shubert v. Ada County*, 166 Idaho 458, 461 P.3d 740 (2020); and Justice Huntley's concurring opinion in *Jones v. City of Saint Maries*, 111 Idaho 733, 738 n.1, 727 P.2d 1161, 1166 n.1 (1986) (Huntley, J., concurring). However, upon closer examination, none of these authorities mandate a three-stage approach to analyzing ITCA claims.

Rather, Idaho Code section 6-903(a) provides for tort liability against a governmental entity if a private person would be liable for the same conduct. Our decision in *Sterling* simply analyzed how to apply that language in the case of uniquely governmental functions that a private person would not have reason to perform. *Sterling*, 111 Idaho at 218, 723 P.2d at 762. At no point in the *Sterling* decision did the Court discuss a three-stage approach to analyzing ITCA claims. Justice Huntley's concurring opinion in *Jones* simply cited the *Sterling* decision as support for his belief that the appropriate starting point for analyzing a claim arising under the ITCA was to analyze whether a private person would be liable for the same conduct. *Jones*, 111 Idaho at 738 n.1, 727 P.2d at 1166 n.1. In short, neither the statute nor the cited decisions mandate a three-stage approach to addressing claims arising under the ITCA.

Given the lack of a justification for the three-stage process mandated in *Walker*, today we abandon that approach and hold that a court reviewing a claim arising under the ITCA is free to consider issues related to duty and immunity under the ITCA in the order of its choosing. While the sequence of analysis proposed in *Walker* may be appropriate in some cases, we believe our trial courts should be permitted to exercise their discretion in deciding how to analyze summary judgment motions concerning tort claims subject to the ITCA. *Cf. Pearson v. Callahan*, 555 U.S. 223, 234–36 (2009) (abandoning "rigid order of battle" framework under the two-pronged, qualified immunity analysis). To that end, our trial courts may analyze and dispose of a claim arising under the ITCA on any ground that a defendant may assert. They no longer are required to analyze the claim according to a rigid series of steps.

**A. The district court did not err by concluding that the District owed no duty in tort to GSN.**

*1. Idaho Code section 31-1401 does not impose a statutory duty on the District in favor of GSN.*

At the summary judgment stage, the district court determined as a matter of law that the District did not owe GSN a statutory duty under Idaho Code section 31-1401. The district court concluded that section 31-1401 did not establish a duty to GSN individually, reasoning that section 31-1401 did not contain any mandatory duty language requiring fire protection districts to undertake certain conduct.

On appeal, GSN alleges that the district court failed to properly interpret the statute. GSN argues that section 31-1401 creates a duty to protect property and preserve life that runs to each individual taxpayer within a fire protection district, including imposing an individual duty of care in favor of GSN. In response, the District asserts that section 31-1401 only establishes a general duty to taxpayers within the district but does not mandate specific action or establish a duty to individual property owners.

"Under Idaho law, 'one owes the duty to every person in our society to use reasonable care to avoid injury to the other person in any situation in which it could be reasonably anticipated or foreseen that a failure to use such care might result in such injury.'" *Henrie v. Corp. of President of Church of Jesus Christ of Latter-Day Saints*, 162 Idaho 204, 208, 395 P.3d 824, 828 (2017) (emphasis omitted) (quoting *Doe v. Garcia*, 131 Idaho 578, 581, 961 P.2d 1181, 1184 (1998)). However, "[t]here is ordinarily no affirmative duty to act to assist or protect another absent unusual circumstances, which justify imposing such an affirmative responsibility." *Id.* (alteration in original) (citation omitted).

One such "unusual circumstance" is when a statute establishes an affirmative duty. *See, e.g.*, *Rees v. State, Dep't of Health & Welfare*, 143 Idaho 10, 15–16, 137 P.3d 397, 402–03 (2006). This Court has recognized that to give rise to an affirmative duty, a statute must "require a particular action by an agency to benefit a particular class of people rather than a duty running to the general public." *Id.* at 16, 137 P.3d at 403. Whether a statutory duty exists is a question of law subject to free review. *Udy v. Custer County*, 136 Idaho 386, 388, 34 P.3d 1069, 1071 (2001).

In *Rees*, this Court concluded that the Idaho Child Protective Act ("ICPA") was intended to protect children, and, to that end, statutory provisions and administrative rules set out mandatory acts that the Idaho Department of Health and Welfare ("the Department") must follow. 143 Idaho at 17–19, 137 P.3d at 404–06. The ICPA directed the Department to investigate suspected child

abuse and set standards for prioritizing investigations of suspected abuse, set time-limits for investigations, and dictated a standardized format for conducting risk-assessments. *Id.* at 18, 137 P.3d at 405. Based on these requirements, this Court concluded that the ICPA imposed an affirmative duty on the Department to competently investigate reported child abuse. *Id.* at 19, 137 P.3d at 406.

In contrast to the ICPA, section 31-1401, entitled "Purpose and policy of law--Short title," generally provides that any portion of a county may establish a fire protection district for the preservation of life and protection of property within the district:

> The protection of property against fire and the preservation of life, and enforcement of any of the fire codes and other rules that are adopted by the state fire marshal pursuant to chapter 2, title 41, Idaho Code, are hereby declared to be a public benefit, use and purpose. Any portion of a county not included in any other fire protection district may be organized into a fire protection district under the provisions of this chapter. All taxable property within any fire protection district created under the provisions of this chapter is and shall be benefited ratably in proportion to assessed valuation by the creation and maintenance of such district, and all taxable property within any such district shall be assessed equally in proportion to its assessed valuation for the purpose of and in accordance with the provisions of this chapter.

Section 31-1401 does not require "a particular action by an agency to benefit a particular class of people" like the statutes and rules at issue in *Rees*. *See Rees*, 143 Idaho at 16, 137 P.3d at 403. Thus, section 31-1401 does not impose an affirmative duty on the District in favor of GSN. We affirm the district court's decision granting the District's motion for summary judgment on GSN's statutory duty claim.

*2. The District did not owe GSN a duty based on a special relationship.*

After holding a court trial on the issue of duty, the district court considered whether the District owed a duty in tort to GSN on the basis of a special relationship. When evaluating the issue, the district court applied a seven-factor test that this Court has previously utilized when considering whether a duty in tort exists due to the existence of a special relationship. *See Coghlan v. Beta Theta Pi Fraternity*, 133 Idaho 388, 399, 987 P.2d 300, 311 (1999). The district court concluded that two of the factors weighed in favor of finding a duty, four of the factors weighed against finding a duty, and one of the factors was neutral. On balance, the district court concluded that GSN failed to show the district court should impose a duty on the District based on a special relationship.

9

GSN argues that the district court erred in its balancing of the factors. GSN does not argue that the district court's findings of fact are clearly erroneous; instead, GSN asks this Court to reweigh the evidence and find the balance favors imposition of a duty against the District.

The District argues that the district court's findings of fact are not clearly erroneous; therefore, this Court need only determine whether the district court properly applied the law to the facts as found. Accordingly, the District maintains that, because the district court's weighing of the factors follows from its findings of fact, this Court should affirm the district court.

An affirmative duty of care can arise based on a special relationship between the parties. *E.g.*, *Henrie*, 162 Idaho at 208, 395 P.3d at 828 (citing *Coghlan*, 133 Idaho at 399, 987 P.2d at 311). This Court has previously recognized special relationships between: (1) a common carrier and its passengers; (2) an innkeeper and its guests; (3) a possessor of land and invitees; (4) a parent and child; (5) an employer and an employee; and (6) a law enforcement officer and a dangerous prisoner. *Coghlan*, 133 Idaho at 401, 987 P.2d at 314 (citing Restatement (Second) of Torts § 314A (1965)) (declining to extend duty to student-college relationship). This Court has not previously recognized a duty between a fire protection district and property owners within the district and, therefore, we must examine the law concerning special relationships to determine whether the relationship between the District and GSN should be deemed a "special relationship" that imposed an affirmative duty of due care on the District in favor of GSN.

"Absent unusual circumstances, a person has no duty to prevent harm to another, regardless of foreseeability." *Beers v. Corp. of President of Church of Jesus Christ of Latter-Day Saints*, 155 Idaho 680, 686, 316 P.3d 92, 98 (2013). "Idaho law recognizes two circumstances in which a person has an affirmative duty of care to another: a special relationship or an assumed duty based on an undertaking." *Id.* GSN asserts the District had an affirmative duty of care based on a special relationship between it and the District.

Evaluating whether a special relationship exists involves considering whether a party has custody or control over another party sufficient to justify imposing an affirmative duty. *Coghlan*, 133 Idaho at 399–400, 987 P.2d at 311–12. This Court has also repeatedly applied a seven-factor test when determining whether to recognize a new type of special relationship. *See, e.g.*, *Turpen v. Granieri*, 133 Idaho 244, 247–48, 985 P.2d 669, 672–73 (1999); *Henrie*, 162 Idaho at 209–10, 395 P.3d at 829–30; *Beers*, 155 Idaho at 685–88, 316 P.3d at 97–100. We have long stated that this Court engages "in a balancing of the harm in those rare situations when we are called upon to

extend a duty beyond the scope previously imposed, or when a duty has not previously been recognized." *Rife v. Long*, 127 Idaho 841, 846, 908 P.2d 143, 148 (1995). Our "balancing of the harm" analysis involves a consideration of the following factors:

    (1) the foreseeability of harm to the plaintiff;

    (2) the degree of certainty that the plaintiff suffered injury;

    (3) the closeness of the connection between the defendant's conduct and the injury suffered;

    (4) the moral blame attached to the defendant's conduct;

    (5) the policy of preventing future harm;

    (6) the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach; and

    (7) the availability, cost, and prevalence of insurance for the risk involved.

*Id.* (citation omitted).

In this case, the district court applied these seven factors to determine whether it should recognize a new type of special relationship for purposes of determining whether the District owed an affirmative duty of care to GSN. However, it did not consider whether the District had custody or control over GSN's property sufficient to justify imposing an affirmative duty of due care. Our caselaw has been inconsistent concerning whether the seven-factor test is one part of a larger inquiry, or if it is the beginning and end of the inquiry. We therefore take this opportunity to clarify our caselaw. For the reasons explained below, the seven-factor test is only one part of the special relationship inquiry. When determining whether a special relationship imposes an affirmative duty of due care, we must employ a two-part framework. The first part of the framework asks whether there is a special relationship between the parties. If the answer to that question is yes, then the second part of the framework requires weighing the seven factors to determine whether policy considerations support imposing an affirmative duty in that circumstance. *See generally Brown v. USA Taekwondo*, 483 P.3d 159, 162 (Cal. 2021) (explaining analytical framework).

This Court first applied the seven-factor test to the special relationship inquiry in *Rife*, 127 Idaho at 846, 908 P.2d at 148. There, this Court considered whether a school district had a duty to supervise children walking to and from school. *See generally Rife*, 127 Idaho 841, 908 P.2d 143. We previously recognized that a school district has a duty to protect students while in the district's custody. *Id.* at 846, 908 P.2d at 148 (citing *Bauer v. Minidoka School Dist. No. 331*, 116 Idaho

586, 778 P.2d 336 (1989)). However, we had not previously extended that duty to circumstances where "the student is no longer in a relationship of control or supervision by the District." *Id.* We analyzed the issue by adopting a seven-factor test first articulated by the California Supreme Court in *Rowland v. Christian*, 443 P.2d 561, 564 (Cal. 1968). *See id.* at 846–47, 908 P.2d at 148–49. We explained that application of the test was appropriate because "whether a duty will arise in a particular instance involves a consideration of policy and the weighing of several factors[.]" *Id.* at 846, 908 P.2d at 148 (citing *Isaacs v. Huntington Memorial Hosp.*, 695 P.2d 653, 658 (Cal. 1985)). Although we concluded that the factors weighed against imposing a duty in the circumstances present in *Rife*, the overriding rationale for our decision was that school districts no longer possess custody and control over students once school ends and they leave school grounds:

> We believe the common law duty arose because the parents are not in a position to protect their children while they are attending school. Thus, the school district bears that burden while the children are in its custody. However, after school has adjourned for the day, and the students have been released, the parents are free to resume control over the child's well-being. Accordingly, we decline to extend a common law duty under the circumstances of this case.

*Id.* at 847, 908 P.2d at 149.

Our decision in *Rife* was unclear regarding whether the policy factors or lack of custody and control by school districts—or a combination of both—were the basis for not imposing a duty. This lack of clarity was also present in subsequent decisions evaluating whether to impose an affirmative duty of care based on a special relationship. *Compare Turpen*, 133 Idaho at 247–48, 985 P.2d at 672–73 (relying on *Rife* factors), *with Coghlan*, 133 Idaho at 399–400, 987 P.2d at 311–12 (relying on lack of custody or control), *and Summers v. Cambridge Joint Sch. Dist. No. 432*, 139 Idaho 953, 956, 88 P.3d 772, 775 (2004) (relying on lack of custody or control), *and Henrie*, 162 Idaho at 210, 395 P.3d at 830 (relying on lack of custody or control and *Rife* factors), *and Beers*, 155 Idaho at 687–88, 316 P.3d at 99–100 (relying on lack of custody or control and *Rife* factors).

A similar lack of clarity permeated the decisions of California's Courts of Appeal concerning the special relationship inquiry. *See generally Brown*, 483 P.3d 159. Appellate courts in California had developed several conflicting frameworks for addressing the interplay between the special relationship doctrine and the *Rowland* factors that this Court adopted in *Rife*. *Id.* at 163. Some courts required plaintiffs to satisfy both the special relationship test and the *Rowland* factors before imposing a duty. *Id.* Other courts imposed a duty when either the special relationship test

or the *Rowland* factors were met and, "[u]nder this approach, *Rowland* serves as an independent source of duty." *Id.* (citations omitted). Still other courts held that the special relationship test incorporated the *Rowland* factors and, therefore, involved the same considerations. *Id.*

The California Supreme Court addressed these differing approaches in *Brown*. *Id.* at 164. The Court concluded that a two-part framework should be applied, beginning with the special relationship doctrine. *Id.* at 164–71. If that doctrine was satisfied, then the court should consider the *Rowland* factors. We agree with the California Supreme Court's decision in *Brown* and adopt the same framework.

When determining whether an affirmative duty should be recognized on the basis of a special relationship, the first question must be whether a special relationship exists. In the absence of a special relationship, the common law does not impose an affirmative duty and there is no need to consider whether the *Rowland* policy factors support imposing an affirmative duty.

The special relationship doctrine has deep roots in the common law of torts and this Court's jurisprudence. *See* Restatement (Second) of Torts § 314A (1965); *Coghlan*, 133 Idaho at 399, 987 P.2d at 311 ("Determining whether a special relationship exist[s] . . . sufficient to impose a duty requires an evaluation of 'the sum total of those considerations of policy which lead the law to say that a particular plaintiff is entitled to protection.'" (quoting William Prosser, Law of Torts 333 (3d ed. 1964))). We have held that a special relationship exists in the following circumstances: "(a) [when] a special relation exists between the actor and a third person which imposes a duty upon the actor to control the third person's conduct, or (b) [when] a special relation exists between the actor and the other which gives the other a right to protection." *Beers*, 155 Idaho at 686, 316 P.3d at 98 (quoting *Turpen*, 133 Idaho at 248, 985 P.2d at 673); *see also* Restatement (Second) of Torts § 315 (1965). "Thus, having control over someone or a duty to protect that person is indicative of a special relationship." *Beers*, 155 Idaho at 686, 316 P.3d at 98.

The *Rife* factors do not consider whether the quintessential aspects of a special relationship—custody and control—are present in a given circumstance. As such, focusing the special relationship inquiry only on the *Rife* factors creates the possibility that an affirmative duty will be imposed in relationships that would not otherwise give rise to a duty under the common law. Focusing the inquiry solely on the *Rife* factors therefore contradicts longstanding principles of tort law. *See* Restatement (Second) of Torts § 314A (1965); *Coghlan*, 133 Idaho at 399, 987 P.2d at 311. Accordingly, we hold today that courts conducting a special relationship inquiry must

first consider whether the hallmarks of a special relationship—custody and control—are present before considering whether the *Rife* factors justify imposing an affirmative duty in that circumstance.

Here, following a three-day court trial, the district court made findings of fact and conclusions of law. After applying its factual findings to the *Rife* factors, the district court concluded that the factors weighed against recognizing an affirmative duty based on a special relationship. The district court never addressed whether the District had custody and control over GSN's property, which would be indicative of a special relationship. For the reasons previously discussed, the district court erred by failing to first determine whether the District had a special relationship with GSN.

The determination of whether there is the requisite special relationship is a question of law over which we exercise free review. *See Turpen*, 133 Idaho at 247, 985 P.2d at 672. Having reviewed the record, we conclude that GSN failed to demonstrate that a special relationship existed between it and the District. This is dispositive of the special relationship inquiry, and we do not reach the district court's application of the *Rife* factors.

There is no special relationship between the District and GSN because (1) the District did not possess control over GSN's property and (2) the District's statutory duties did not run to individual district taxpayers such as GSN. First, the District did not provide fire protection services to GSN such that it took custody of, or exercised control over, GSN's property. The District has 184 square miles of property and "conducts firefighting and emergency response within that territory." As was the case here, the District responds to a fire threatening property within the district, mobilizes available resources, and provides firefighting operations as a public benefit. The District did not take custody of GSN's property or control the property in a way that impacted GSN's ability to prevent fire losses on its property. *See* Restatement (Second) of Torts § 320 cmt. b (1965) ("The circumstances under which the custody of another is taken and maintained may be such as to deprive him of his normal ability to defend himself[.]").

Second, the District does not owe a duty to protect individual properties within its territory. As we discussed above regarding whether Idaho Code section 31-1401 gave rise to a statutory duty, that provision contains no mandates for the benefit of individual district taxpayers such as GSN. The District was not required to devote resources to GSN individually and, as a general matter, was under no obligation specific to GSN as opposed to every other taxpayer in the district.

14

Under these circumstances, the District did not possess a duty to *protect GSN* indicative of a special relationship. Accordingly, we affirm the district court's conclusion that the District did not owe GSN a duty in tort based on a special relationship. *Syringa Networks, LLC v. Idaho Dep't of Admin.*, 159 Idaho 813, 827, 367 P.3d 208, 222 (2016) ("[I]t is well-settled that where an order of a lower court is correct, but based on an erroneous theory, the order will be affirmed upon the correct theory." (alteration in original) (citation omitted)).

   3. *The District did not assume a duty to GSN.*

Following the court trial, the district court concluded that the District did not assume a duty because it found that the District did not undertake any firefighting services on GSN's property until after the fire was contained.

GSN asserts that the district court erred because the District assumed a duty to it based on two theories: (1) by "voluntarily engaging in the protection of the GSN property" on the day of the fire, and (2) by previously undertaking fire suppression services for the benefit of the fire district.

The District argues that the district court correctly concluded that the District did not undertake any firefighting efforts for GSN until after the fire was contained, and GSN has not alleged those firefighting operations were negligent. The District asserts that GSN's negligence claim is based on actions the District failed to take, which supports the district court's finding that the District never undertook any action that gave rise to an assumed duty.

"Even when an affirmative duty generally is not present, a legal duty may arise if 'one voluntarily undertakes to perform an act, having no prior duty to do so.'" *Dupuis v. E. Idaho Health Servs., Inc.*, 168 Idaho 648, 656, 485 P.3d 144, 152 (2021) (quoting *Baccus v. Ameripride Servs., Inc.*, 145 Idaho 346, 350, 179 P.3d 309, 313 (2008)). "Liability for an assumed duty, however, can only come into being to the extent that there is in fact an undertaking." *Udy*, 136 Idaho at 389, 34 P.3d at 1072 (citation omitted); *see also Beers*, 155 Idaho at 688–89, 316 P.3d at 100–01. If an undertaking occurs, then "the duty arises to perform the act in a non-negligent manner." *Forbush v. Sagecrest Multi Fam. Prop. Owners' Ass'n, Inc.*, 162 Idaho 317, 326, 396 P.3d 1199, 1208 (2017) (citation omitted). Thus, an assumed duty arises when: (1) one previously has undertaken to perform a voluntary undertaking; (2) others are relying on the continued performance of the service; and (3) it is reasonably foreseeable that legally-recognized harm could result from failure to perform the undertaking. *Id.* (citation omitted).

15

The district court's conclusion follows from its findings. The district court found that there was no voluntary undertaking by the District to provide firefighting services to GSN until the early morning hours of July 27. GSN has not argued that this finding is unsupported by substantial and competent evidence. Instead, GSN points to two other earlier undertakings that it argues shows the District assumed a duty. We decline GSN's offer to reweigh the evidence and make a different finding of fact concerning when the District undertook a duty. *See Cook v. Van Orden*, 170 Idaho 46, 57, 507 P.3d 119, 130 (2022). The district court's conclusion that the District did not assume a duty until the early morning hours of July 27 follows from its findings. Therefore, we affirm the district court's conclusion that the District did not owe GSN a duty in tort.

Our decision affirming the district court's conclusion that the District did not owe a duty to GSN fully disposes of GSN's negligence claim. As a result, we need not consider whether the District was entitled to discretionary function immunity under the Idaho Tort Claims Act or to immunity under the Idaho Disaster Preparedness Act.

**B. We do not award either party attorney fees on appeal.**

Both parties request fees on appeal. GSN requests fees under Idaho Code section 6-918A. However, GSN has not prevailed on appeal and is, therefore, not entitled to fees.

Although the District has prevailed on appeal, it does not specify the basis for its entitlement to fees. "This Court 'will not consider a request for attorney fees on appeal that is not supported by legal authority or argument.'" *Alpha Mortg. Fund II v. Drinkard*, 169 Idaho 446, 453, 497 P.3d 200, 207 (2021) (quoting *Frank v. Bunker Hill Co.*, 150 Idaho 76, 80, 244 P.3d 220, 224 (2010)). Therefore, we do not award the District attorney fees on appeal.

## V.    CONCLUSION

The district court's judgment dismissing GSN's negligence claim is affirmed. The District is awarded its costs on appeal pursuant to Idaho Appellate Rule 40.

Chief Justice BEVAN, and Justices BRODY, STEGNER, and MOELLER CONCUR.